## FREDERICK S. GRAM AND OTHERS v. VILLAGE OF SHOREVIEW AND OTHERS.

106 N. W. (2d) 553.

December 2, 1960—No. 38,229.

*Larson, Lindquist, Fraser & Magnuson* and *Richard E. Wetherall,* for appellants.

*Thomas, King, Daubney, Swenson & Collatz* and *Peterson & Popovich,* for respondents.

*Dorsey, Owen, Barber, Marquart & Windhorst,* amicus curiae.

KNUTSON, JUSTICE.

This is an appeal from a judgment of dismissal.

The action was brought by plaintiffs as taxpayers and property owners of the village of Shoreview seeking a declaratory judgment holding that proceedings taken by the village under Minn. St. c. 429 for the establishment of sanitary sewers in a part of the village were invalid and seeking injunctive relief against further action under such proceedings. Inasmuch as the only issue for our determination is whether Minn. St. c. 562 is constitutional, we will state the facts only in so far as is essential to an understanding of our determination of that issue.

In the latter part of 1959, or early in 1960, the officials of the village of Shoreview were advised that, if they so desired, they could enter into a contract with the village of Roseville for the connection of sanitary sewers in Shoreview with those then being constructed in Roseville. If the connections were to be made, it would be necessary for Roseville to build its trunk line sewers larger than would be necessary to handle its own sewage. As a result of these negotiations, the village council of Shoreview decided that it would be advantageous to go ahead with this plan, and on January 22, 1960, it entered into a tentative contract with Roseville under which Shoreview obligated itself to pay its share of the cost of interceptor sewers and of building Roseville's trunk line sewers large enough to handle the sewage from Shoreview. Pursuant to the requirements of c. 429, notice of a public hearing was published, and such hearing was held on March 29, 1960. Plaintiffs and many others attended this meeting.

Plaintiffs objected to the project, but on April 5, 1960, the council of Shoreview voted to proceed with the project. Plaintiffs and others sought unsuccessfully to induce the council to abandon the project in whole or in part or, in any event, to hold another meeting. Pursuant to petitions which were filed by certain citizens objecting to the project, a part of the original project was abandoned.

As a result of the decision of the village council, in addition to the contract which the village entered into with Roseville, Shoreview entered into contracts under which it became obligated for engineering and legal services and also entered into a contract for the construction of the first section of the project, part of which had been completed prior to the commencement of this action. By that time Roseville was completing its enlarged trunk sewers to accommodate Shoreview. Proceedings were commenced for the sale of bonds in the principal amount of $800,000 with which to defray a part of the cost of the project. The sale of such bonds was scheduled for August 17, 1960, at which time a bid was received for the purchase of the bonds at an interest rate of 4.06 percent. One of the conditions of the sale of the bonds was the customary requirement that the bonds would be delivered within 30 days, accompanied by a certificate of nonlitigation and an approving legal opinion by bond attorneys that were acceptable to the purchaser stating that no litigation was pending or threatened. The pendency of this suit prevented the furnishing of such certificate and the approving legal opinion so that the village has been unable to deliver the bonds and obtain the proceeds from the sale. As a result, suit was instituted by a contractor against the village, and the village of Roseville has informed Shoreview that it must require payment of interest on the amount Shoreview is obligated to pay Roseville.

On August 3, 1960, this action was commenced seeking a declaratory judgment invalidating the proceedings of the village. On August 11, defendants moved the court for an order requiring plaintiffs to furnish a surety bond under § 562.02. Based upon affidavits and oral testimony in which it appeared that substantial damages might develop from the inability of Shoreview to deliver its bonds because of an increase in the interest rate and that the village might be liable for

damages incurred by the contractor who had already performed part of his work, for engineering services, and for legal expenses, the court ordered plaintiffs to furnish a surety bond in the principal amount of $60,000 on or before August 16, 1960, and that the action was dismissed with prejudice if such bond was not furnished. Upon failure to furnish the required bond within the required time, judgment dismissing the action with prejudice was entered pursuant to the court's order, and this appeal is from the judgment so entered.

Section 562.02 provides:

"Whenever any action at law or in equity is brought in any court in this state questioning directly or indirectly the existence of any condition or thing precedent to, or the validity of any action taken or proposed to be taken, by any public body or its officers or agents in the course of the authorization or sale, issuance or delivery of bonds, the making of a contract for public improvement or the validity of any proceeding to alter the organization of a school district in any manner, such public body may move the court for an order requiring the party, or parties, bringing such action to file a surety bond as hereinafter set forth. Three days written notice of such motion shall be given. If the public body is not a party to the action, but if it deems that such action be injurious to the public interest and to the taxpayers, such public body may intervene or appear specially for the purpose of making such motion. If the court determines that loss or damage to the public or taxpayers may result from the pendency of the action or proceeding, the court may require such party, or parties, to file a surety bond, which shall be approved by the court, in such amount as the court may determine. Such bond shall be conditioned for payment to the public body of any loss or damage which may be caused to the public body or taxpayers by such delay, to the extent of the penal sum of such bond, if such party, or parties, shall not prevail therein. If such surety bond is not filed within a reasonable time allowed therefor by the court, the action shall be dismissed with prejudice. If such party, or parties, file a bond as herein required and prevail in the action, any premium paid on the bond shall be repaid by or taxed against the public body."

Similar acts have been enacted in other areas. Section 360.141, dealing with the subject of aeronautics, and § 462.713, dealing with actions brought under the Municipal Housing and Redevelopment Act, are of a similar nature.

In Ashenbrenner v. City of East Grand Forks, 257 Minn. 368, 102 N. W. (2d) 28, we held that the court did not abuse its discretion in requiring a bond in the sum of $250,000 under § 562.02 in an action involving proceedings by the city to establish a sewage disposal plant.

In Sisto v. Housing and Redevelopment Authority of Duluth, 258 Minn. 391, 104 N. W. (2d) 529, we held that under § 462.713 there was nothing for us to review where a required surety bond was not furnished and a supersedeas bond was not filed on appeal, inasmuch as the action had become dismissed before the case reached this court by failure to comply with the order requiring the surety bond.

The constitutionality of the statutes involved in these two cases was not raised or considered. While the language of § 562.02 is slightly different from that involved in the Sisto case, the Sisto case is controlling here if the act is constitutional.

Plaintiffs contend that c. 562 violates that portion of U. S. Const. Amend. XIV, § 1, which provides:

"* * * nor shall any state deprive any person of life, liberty, or property without due process of law,"

and Minn. Const. art. 1, §§ 2, 7, and 8. The portion of art. 1, § 7, which is involved deals with due process and is similar to the provision of U. S. Const. Amend. XIV which plaintiffs claim is controlling. Minn. Const. art. 1, § 8, provides:

"Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or character; he ought to obtain justice freely and without purchase; completely and without denial; promptly and without delay, conformable to the laws."

We have found no case in our research involving the constitutionality of an act such as we have here which regulates the right of a taxpayer to maintain a suit against a municipal corporation. By analogy, the right of a taxpayer to maintain such suit is based on the same principles

as the right of a stockholder in a private corporation to bring an action against the corporation or its officers to protect the corporate assets from the illegal and fraudulent acts of its officers. This similarity is recognized in 52 Am. Jur., Taxpayers' Actions, § 4, where we find the following statement:

"* * * The principle upon which the doctrine in regard to municipal corporations is based flows from its analogy to a well-settled doctrine in equity governing private corporations, where each stockholder has an interest in the property of the corporation and may interfere to protect the corporate funds from the illegal or fraudulent acts of its officers. The right of a taxpayer to resort to a court of equity to enjoin misapplication of public funds is based upon the taxpayer's equitable ownership of such fund, and his liability to replenish the public treasury for the deficiency which would be caused by the misappropriation."

The similarity in the two actions is also recognized in 4 Dillon, Municipal Corporations (5 ed.) § 1580, where the author says:

"The doctrine of the preceding section [involving the right of a taxpayer to maintain an action against a municipal corporation] is also supported by an analogy supplied by a settled rule of equity applicable to private corporations. In these the ultimate *cestuis que trust* are the stockholders. In municipal corporations the *cestuis que trust* are in a substantial sense the inhabitants embraced within their limits."[1]

In such derivative actions, involving the right of a stockholder to maintain a suit in equity against the corporation, it has frequently been held that a statute requiring such stockholder to furnish security to protect the corporation in case the suit goes against him is not violative of the Federal or state constitutions. Most of the questions raised here are answered in such decisions.

In Cohen v. Beneficial Industrial Loan Corp. 337 U. S. 541, 549, 69 S. Ct. 1221, 1227, 93 L. ed. 1528, 1538, the United States Supreme Court construed a New Jersey statute[2] which permitted the

---

[1]See, also, Annotation, 58 A. L. R. 588, 597.

[2]Laws of New Jersey 1945, c. 131 (N. J. Stat. Ann. [Perm. ed.] §§ 14:3-15 to 14:3-17).

corporation to require a stockholder having less than 5 percent of the capital stock, unless his stock had a market value of more than $50,000, to give security for reasonable expenses, including attorneys' fees, incurred by the corporation in defending an action against it in the event the result was unfavorable to the stockholder. The court said:

"* * * a stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity. And while the stockholders have chosen the corporate director or manager, they have no such election as to a plaintiff who steps forward to represent them. He is a self-chosen representative and a volunteer champion. The Federal Constitution does not oblige the state to place its litigating and adjudicating processes at the disposal of such a representative, at least without imposing standards of responsibility, liability and accountability which it considers will protect the interests he elects himself to represent. * * *

* * * * *

"* * * A state may set the terms on which it will permit litigations in its courts. No type of litigation is more susceptible of regulation than that of a fiduciary nature. And it cannot seriously be said that a state makes such *unreasonable* use of its power as to violate the Constitution when it provides liability and security for payment of *reasonable* expenses if a litigation of this character is adjudged to be unsustainable. It is urged that such a requirement will foreclose resort by most stockholders to the only available judicial remedy for the protection of their rights. Of course, to require security for the payment of any kind of costs, or the necessity for bearing any kind of expense of litigation, has a deterring effect. But we deal with power, not wisdom; and we think, notwithstanding this tendency, it is within the power of a state to close its courts to this type of litigation if the condition of reasonable security is not met."

In Beyerbach v. Juno Oil Co. 42 Cal. (2d) 11, 265 P. (2d) 1, the California court upheld its statute (Calif. Corporations Code, § 834) against the claim that it violated the equal protection clause of U. S. Const. Amend. XIV, § 1, and the provisions of the state constitution against special laws and against special privileges and immunities, following in large part the United States Supreme Court decision in Cohen v. Beneficial Industrial Loan Corp. *supra*. One of the arguments advanced there, as here, was that the statute discriminated against poor stockholders who would be unable to furnish the required security. In rejecting this contention, the California court said (42 Cal. [2d] 20, 265 P. [2d] 6):

"Plaintiff argues that section 834 unconstitutionally discriminates against poor stockholders who are unable to furnish the required security. But if plaintiff's argument in this respect were accepted then any statute which required the payment of a fee or the furnishing of security as a prerequisite to the filing of a complaint, the issuance or levying of a writ, the procurement of a record on appeal, etc., would be unconstitutional."[3]

Statutes requiring security as a prerequisite to an appeal have existed in this state and elsewhere, almost without challenge as to their constitutionality, from the origin of our state governments. In those cases where they have been challenged, it has been universally held that they are not unconstitutional.[4]

In Hier v. Anheuser-Busch Brewing Assn. 52 Neb. 144, 71 N. W. 1005, many of the same arguments were advanced against a statute requiring a bond as a prerequisite to an appeal to the district court from a county court. In upholding the constitutionality of such requirement, the Nebraska court said (52 Neb. 145, 71 N. W. 1005):

"* * * It is left to the legislature to provide the manner of taking an appeal, and the legislature has undoubtedly the power to provide such requirements and attach such conditions as are necessary to

---

[3]See, also, Hogan v. Ingold, 38 Cal. (2d) 812, 243 P. (2d) 1, 32 A. L. R. 834.

[4]See, 4A C. J. S., Appeal and Error, § 502b.

protect the adverse party. * * * Such a requirement [that a bond be furnished] does not restrict the right or deny it. It merely regulates the manner of exercising the right."

With respect to the argument that some litigants might be deprived of the right of appeal by their inability to furnish security, the Nebraska court said (52 Neb. 146, 71 N. W. 1006):

"* * * The mere fact that some litigants may be so unfortunate as to be unable to procure sureties upon a bond does not, as is contended, render the statute objectionable as being in the interest of the wealthy classes. One who, through poverty, is unable to pay costs or attorney's fees is equally precluded from his remedies. But this is not by virtue of the statute; it is by virtue of his own unfortunate circumstances, which neither the legislature nor the constitution can control."[5]

While the statute now under consideration is of comparatively recent origin, we have long required a bond as a prerequisite to the issuance of a temporary injunction. § 585.04. The provisions of this section are mandatory,[6] while it is discretionary under § 562.02 whether a bond should be required or not. In addition, § 562.02 provides that, if the party, or parties, files a bond as required and prevails in the action, any premium paid on the bond shall be repaid by or taxed against the public body. No such provision appears in § 585.04. Thus, it seems that the provisions of § 562.02 are less onerous to a litigant than § 585.04.

Many other statutes, such as those governing appeals, replevin actions, and attachment, require security for costs, and it has never been doubted that such requirements were constitutional. While plaintiffs chose to proceed without seeking injunctive relief pendente lite, the

[5]See, also, Harrigan v. Gilchrist, 121 Wis. 127, 214, 99 N. W. 909, 929, where the court discusses the constitutional provision having its origin in Magna Carta, which provides: "Every person ought to obtain justice freely and without being obliged to purchase it, completely and without denial, promptly and without delay."

[6]Independent School Dist. No. 35 v. Oliver Iron Min. Co. 169 Minn. 15, 208 N. W. 952, 210 N. W. 856; Bellows v. Ericson, 233 Minn. 320, 46 N. W. (2d) 654.

effect of the action, for all practical purposes, is the same as if a temporary injunction had been procured. The bonds of the village cannot be sold until the litigation is at an end and a proper certification of nonlitigation furnished. Without money to defray the cost of the improvement, work has necessarily ceased, and the project is at a standstill just as much as if the village had been enjoined from proceeding.

Obviously, the same arguments could be advanced against the constitutionality of a statute requiring a bond as security for damages which might result from the issuance of a temporary injunction. The fact that a rather substantial bond is required is due, at least in part, to the delay of plaintiffs in commencing their action. If the action had been commenced as soon as plaintiffs knew what action the village council intended to take, the potential damage could have been greatly minimized and no doubt a bond, if required at all, would have been in a greatly reduced amount. Delay, intentional or not, until contract obligations had been incurred, has caused the potential damage to be enhanced to such an extent as to necessitate a substantial bond. It is probable that one of the most salutary effects of a statute such as we have here is to encourage those who wish to challenge the action of the governing body of a municipality to commence their actions before any substantial damage will result from a delay in the prosecution of the project.

The only other contention of plaintiffs is that the court erred in rejecting evidence offered for the purpose of showing plaintiffs' financial inability to furnish the required bond. Such evidence would not be relevant on the issue of constitutionality and was properly rejected. We could hardly hold that the statute is constitutional as to financially responsible litigants and unconstitutional as to those who are financially irresponsible.

We fail to see any constitutional barrier, either under the Federal or state constitutions, to the power of the legislature to enact the statute under consideration.

Affirmed.

MR. JUSTICE LOEVINGER took no part in the consideration or decision of this case.