OPINION OF THE COURT
Joseph Harris, J.
Plaintiffs, citizen-taxpayers, bring this proceeding for a declaratory judgment pursuant to CPLR 3001, and article 7A, § 123-b (1) of the State Finance Law, seeking a judgment declaring unconstitutional, sections 1, 2, 3 and 10 of Laws of 1990 (ch 220) (section 1 of said law now codified in Public Authorities Law, art 10-B, tit 4, §§ 3231-3249; section 2 now codified in Tax Law § 1148; section 3 now codified in State Finance Law § 92-r; section 10 not codified in the Consolidated Laws), which established, effective June 11, 1990, a New York Local Government Assistance Corporation (hereinafter referred to as LGAC or the Corporation), a public benefit corporation of the State of New York, for the purpose of providing certain assistance payments to units of local government within the State through issuance and sale of bonds of the Corporation, for alleged violation of the following provisions of the New York State Constitution: article VII, § 11; article VII, § 8; and article X, § 5; and further declaring unconstitutional, that portion of article 7 A, § 123-b (1) of the State Finance Law that denies "standing” to a citizen-taxpayer respecting reve *596 nue measures. This proceeding was brought on by a complaint and an order to show cause dated February 6, 1992, returnable February 28,1992.
Plaintiffs moved for a final judgment and a preliminary injunction. The preliminary injunction was denied after oral argument on the return date of the motion.
Defendants cross-moved to dismiss the complaint upon the following grounds: (1) That the bonds issued and to be issued by the Corporation are not State debt within article VII, § 11 of the NY Constitution as a matter of law, and that accordingly the complaint fails to state a cause of action; (2) that the plaintiffs are guilty of loches by delaying their suit an inordinate period of time and after approximately half of the authorized bonds have been issued; (3) that plaintiffs lack "standing” to maintain this lawsuit both by virtue of section 123-b (1) of the State Finance Law and controlling case law; (4) that there is no constitutional right to "citizen-taxpayer standing”, that section 123-b (1) of the State Finance Law is constitutional on its face, and accordingly, the complaint fails to state a cause of action respecting that prong of the plaintiffs’ action.
All parties have agreed that all motions herein be converted to a motion for summary judgment under CPLR 3211 (c), without any further submissions, and that all issues be resolved by summary judgment.
MODUS OPERANDI OF THE NEW YORK LOCAL GOVERNMENT ASSISTANCE CORPORATION[1]
The New York Local Government Assistance Corporation is a corporate governmental agency constituting a public benefit corporation, created by Laws of 1990 (ch 220), as amended by Laws of 1990 (ch 946) and Laws of 1991 (ch 2) (the Act), for the purpose of providing certain assistance payments to units of local government within the State. To fulfill that purpose, the Corporation was given the authority, among other things, to issue and sell its bonds and notes to fund local assistance payments for elementary and secondary education, community college aid and tuition assistance programs, payment of the non-Federal share of local Medicaid costs and other local *597 assistance programs, including revenue-sharing assistance, and for health and the improvement of environmental quality, housing initiatives, mental health and drug abuse programs, mass transportation and highway and bridge programs. The Corporation is empowered by the Act to borrow money and issue its bonds and notes to achieve its corporate purposes in an amount not in excess of $4.7 billion (exclusive of certain refunding bonds) plus amounts required to fund a capital reserve fund, to provide for certain capitalized interest and to pay costs of issuance. However, the Act provides that the Corporation shall not issue its bonds or notes for those purposes unless the State Legislature has enacted an appropriation or appropriations providing for the amount and manner of such payments.
The bonds will be general obligations of the Corporation upon issuance, payable from (i) payments received by the Corporation from revenues derived from certain sales and compensating use taxes imposed by the State on a State-wide basis at the rate of 4% pursuant to sections 1105 and 1110 of the Tax Law (the Sales Tax) and required to be deposited in the Local Government Assistance Tax Fund created by the Act (the Tax Fund) at the rate of 1%, less amounts which the Commissioner of Taxation and Finance of the State may determine to be necessary for refunds (the 1% Sales Tax), and (ii) other moneys pledged under the bonding resolution, including amounts on deposit in, and earned on investment of, a Capital Reserve Fund established pursuant to the Act and the bonding resolution (the Capital Reserve Fund).
The resolution establishes the requirement of the Capital Reserve Fund as an amount equal to the maximum amount of principal, sinking fund installments, if any, and interest on all bonds outstanding during the then current or any succeeding fiscal year (the Capital Reserve Fund Requirement). The additional requirement of the Capital Reserve Fund will be funded from a portion of the proceeds of additional series of bonds. It is a condition to the issuance of additional bonds that the Capital Reserve Fund shall, upon the issuance of additional bonds, be funded at the Capital Reserve Fund Requirement. If there is a deficiency in the Capital Reserve Fund, the chairperson of LGAC is required immediately to certify the amount needed to restore the Capital Reserve Fund to the Capital Reserve Fund Requirement, to the extent that the deficiency resulted from a failure by the State to pay any amounts previously certified by the chairperson.
*598 The Corporation has no taxing power. The bonds, by specific mandate of the Act (see, Public Authorities Law § 3242), do not constitute an enforceable obligation or a debt of the State or any unit of local government, and neither the State nor any unit of local government shall be liable thereon. Neither the faith and credit nor taxing power of the State or any unit of local government is pledged to the payment of the principal or redemption price of or interest on the bonds. The Act specifically requires that this information be prominently displayed on all bonds and bond prospectuses (Public Authorities Law § 3242).
The bonds of the Corporation will be secured primarily by the 1% Sales Tax. Upon receipt, moneys from the 1% Sales Tax are required to be deposited in the Tax Fund, held jointly by the Commissioner of Taxation and Finance and the Comptroller separate and apart from all other moneys of the State. Moneys in the Tax Fund are required by the Act to be paid by the Comptroller to the trustee for the bonds, at the times and in the amounts certified by the chairperson of the Corporation, subject to annual appropriation by the State Legislature.
The Act provides procedures for impounding the 1% Sales Tax in the Tax Fund which are designed to assure sufficient moneys will be on deposit in the Tax Fund to meet the Corporation’s annual cash requirements, as certified by the chairperson. Subject to the annual appropriation referred to above, the Comptroller is required to pay, directly into the debt service fund held under the bonding resolution, in the amount required for debt service on the bonds, at least five days prior to a payment date, from amounts impounded in the Tax Fund. If those amounts are insufficient, the Comptroller is required by the Act, without further appropriation, to transfer sufficient money from the General Fund of the State to the Tax Fund to pay the amount required for debt service.
Under the Act, no moneys on deposit in the Tax Fund may be disbursed from the fund until an appropriation has been made to the Corporation. If and to the extent that such an appropriation has been made, and subject to the impoundment procedures just described, excess moneys on deposit in the Tax Fund may be transferred to the General Fund to be applied to other purposes of the State. If, however, any payment for debt service is not made to the Corporation when due, then all moneys on deposit in, or deposited to, the Tax Fund are required by the Act to be retained in the Tax Fund, even if an *599 appropriation has been made, until all required payments to the Corporation are current.
Under the State Constitution, the State is permitted to amend, modify or otherwise alter the Sales Tax and cannot be bound or obligated to continue the imposition of the 1% Sales Tax and may repeal the provisions thereof under the Act benefiting the Corporation. Further, under the State Constitution, the State may appropriate at least annually to the Corporation from the Tax Fund the amounts certified in the chairperson’s certificate, but the State cannot be bound or obligated to make such appropriations. (See, NY Const, art X, §1.)
The Corporation expects, however, that the State will make such annual appropriations as long as the Corporation’s bonds are outstanding. Under existing law, if no such appropriation is made, substantial portions of the 1% Sales Tax not needed by the Corporation for the payment of its debt service would be set aside in the Tax Fund and thus remain unavailable to the State for its other purposes. In addition, the Corporation believes that any failure by the State to make annual appropriations as expected would have a serious impact on the ability of the State and its authorities to raise funds in the public credit markets.
The Corporation was created as part of a fiscal reform program of the State aimed at eliminating the State’s practice of financing substantial amounts of local assistance payments through its annual seasonal borrowing during the first quarter of the State fiscal year (the Spring Borrowing). The Corporation is empowered, among other things, to issue bonds for the purpose of financing local assistance payments in a manner that would provide funds to local governments earlier in their respective fiscal years than had been the State’s traditional practice. When the Corporation issues the full amount of bonds it is authorized to issue, the State expects to eliminate the need for the Spring Borrowing.
The Corporation expects to issue the full amount of its authorization, which is $4.7 billion principal amount of bonds plus any amounts issued for costs of issuance, capitalized interest and reserves, prior to January 1, 1994. As a condition precedent to the issuance of bonds or notes, the Act requires that the Legislature has enacted an appropriation or appropriations for the amount and manner of payments for the purpose of making local government assistance payments. Pursu *600 ant to legislative authorization, the Corporation has previously issued $1,917,456,517.90 aggregate principal amount of bonds, the net proceeds of $1.7 billion of which have been used for the purpose of financing assistance payments to school districts. After the issuance of the Series 199ID bonds, there remains authorization to issue bonds sufficient to produce $300 million in net proceeds for such purposes for the balance of the 1991-1992 fiscal year. The Corporation expects that the Legislature will appropriate such additional amounts as are necessary to permit it to issue its maximum authorization of $4.7 billion in subsequent State fiscal years. Subject to market conditions and other factors, the Corporation expects to issue bonds sufficient to produce $1.6 billion in net proceeds in each fiscal year until the full amount of its authorization has been issued. Those amounts may be increased or decreased, or the timing of issuance may be revised, as a result of then-current circumstances, which are currently unforeseen or unpredictable.
The following table sets forth (1) receipts from the net Sales Tax collections for the State’s 1990-1991 fiscal year, (2) receipts from the 1% Sales Tax for the State’s 1990-1991 fiscal year, (3) estimated maximum annual debt service after issuance of $4.7 billion principal amount of bonds, plus an estimated $584,416,518 principal amount of bonds issued to fund the Capital Reserve Fund, original issue discount and to pay costs of issuance assuming an 8% rate of interest, or assuming a 9% rate of interest, $612,441,518 principal amount of bonds issued to fund the Capital Reserve Fund, original issue discount and to pay costs of issuance and (4) resulting debt service coverage. Repeal of the March prepayment of Sales Tax resulted in collection of less than 12 months of Sales Tax in the State’s 1990-1991 fiscal year. There can be no assurance that actual Sales Tax collections will remain at the levels of the 1990-1991 fiscal year or that future debt service requirements will not exceed those shown, as a result of numerous factors affecting Sales Tax collections and the level of interest rates that cannot be predicted. The Corporation believes, however, based on information supplied by the director of the budget relating to the Sales Tax, that the amounts and coverage estimates set forth in table 3 are reasonable.
*601 TABLE 3 ESTIMATED DEBT SERVICE COVERAGE
Assuming Future Interest Rate of 8%
Assuming Future Interest Rate of 9%
1990-1991 Fiscal Year 4% sales Tax Receipts $5,405,347,000 $5,405,347,000
1990-1991 Fiscal Year 1% Sales Tax Receipts (1) 1,339,336,750 1,339,336,750
Maximum Annual Debt Service (2) 453,112,140 480,792,419
Debt Service Coverage (3) (4) 2.96 2.79
(1) Net of an estimated $12,000,000 in collection expenses.
(2) Amounts include actual outstanding debt and future debt service projected at the indicated interest rate on a level debt service basis.
(3) Assumes no interest earnings on the Capital Reserve Fund. If interest earnings are assumed at the bond interest rate, debt service coverage would be 3.20 and 3.04, respectively.
(4) If the estimated impact of the repeal of the March prepayment ($313 million) is considered, debt service coverage would be 3.13 and 2.95, respectively.
The Act does not restrict the right of the State to amend, repeal, modify or otherwise alter the Sales Tax. In addition, the Act permits, after appropriation of the Corporation’s cash requirements, moneys derived from the 1% Sales Tax in the Tax Fund to be paid over the General Fund. The Act could be amended to provide that those moneys be used as a source of payment for financings by the Corporation in excess of its current authorization or for separate financings by other authorities of the State. (See, NY Const, art X, § 1.)
Subject to appropriation, moneys on deposit in the Local Government Assistance Tax Fund are required by the Act to be paid to the Corporation in the amounts and at times set forth in the certification of the chairperson of the Corporation required to be delivered to the Comptroller and the Governor under the Act.
Under the Act, no person (including the Corporation or the holders of bonds or notes) shall have any lien on revenues from the 1% Sales Tax held in the Tax Fund, and the provisions of the Act requiring the State to make payments from the Tax Fund shall be executory only to the extent of revenues from the 1% Sales Tax available to the State in the Tax Fund. If, however, the amount set aside by the Comptroller in the Tax Fund is insufficient to meet the payments required pursuant to the chairperson’s certificate on any *602 payment date, then the Comptroller is required by the Act to immediately transfer from the State’s General Fund to the Tax Fund, without an additional appropriation, an amount which, when combined with the amount set aside under the impoundment provisions, shall be sufficient to meet the payment required pursuant to the chairperson’s certificate.
The State may not make any payment without an appropriation. An appropriation is an authorization approved by the State Legislature to make payments. The State Constitution requires all appropriations of State funds to be approved by the State Legislature at least every two years. In addition, the State Finance Law provides that appropriations shall cease to have force and effect, except as to liabilities incurred thereunder, at the close of the fiscal year for which they were enacted and that to the extent of liabilities incurred thereunder, such appropriations shall lapse on the succeeding September 15th. The State Legislature may not be bound in advance to make an appropriation, and there can be no assurances that the State Legislature will appropriate the necessary funds as anticipated. The Corporation expects that the State Legislature will make an annual appropriation from amounts on deposit in the Tax Fund in amounts sufficient to pay debt service on the bonds.
Deposits to the Tax Fund are expected to exceed the amounts necessary to pay debt service on the bonds, as described under "Estimated Debt Service Coverage” above. The Act contains provisions for the accumulation and setting aside of the 1% Sales Tax to be paid, subject to appropriation, to the Corporation. The effect of those provisions is that, if an appropriation for and payment of the Corporation’s debt service on the bonds is not made, the revenues from the 1% Sales Tax will, under existing law, remain in the Tax Fund and will thus not be available for other State purposes.
If the Legislature should fail to make an appropriation for the payment of debt service on general obligation bonds of the State to which the full faith and credit of the State has been pledged, the State Constitution requires the Comptroller to set apart from first revenues thereafter received, applicable to the General Fund of the State, a sum sufficient to pay such debt service and provides that the Comptroller may be required to set aside and apply such revenues to debt service on such bonds at the suit of any holder of such bonds. Because the State has never failed to make an appropriation for debt service on its general obligations bonds, there has never been *603 an occasion for a court to determine the extent of the remedies available to a holder of the State’s general obligation bonds, under such circumstances, with respect to revenues such as the 1% Sales Tax, which are required to be deposited in the Tax Fund.
The Corporation believes that any failure by the State Legislature to make annual appropriations as contemplated would have a serious impact on the ability of the State and its agencies and public benefit corporations to raise funds in the public credit markets.
Pursuant to the Act and the Corporation’s bonding resolutions, the Corporation established a Capital Reserve Fund, held by the trustee for the benefit of holders of the bonds and previously funded to the Capital Reserve Fund Requirement from the proceeds of prior series of bonds. The Capital Reserve Fund Requirement, as of any date of calculation, is an amount equal to the maximum annual amount of principal, sinking fund installments, if any, or redemption price of and interest on all bonds outstanding or on any related reimbursement obligation coming due during the current or any succeeding fiscal year.
In summary, respecting the manner in which the Corporation’s bonds are to be paid, the Comptroller of the State of New York, subject to appropriation by the State Legislature, is required to pay from the moneys impounded in the Local Government Assistance Tax Fund, directly into a "Debt Service Fund”, at least five days prior to a payment date, the amount required for debt service on the bonds. If the amounts so impounded are insufficient, the Comptroller, without further appropriation, is required to transfer sufficient moneys to the Tax Fund from the General Fund of the State. If a shortfall exists in the Debt Service Fund immediately prior to a payment date on the bonds, moneys on deposit in the Capital Reserve Fund sufficient to replenish the shortfall are required to be applied to the Debt Service Fund for the payment of debt service on the bonds. If the Capital Reserve Fund is drawn upon for such purposes, the chairperson is required immediately to certify amounts required to restore the Capital Reserve Fund to its requirement, and upon such certification the Comptroller is required to impound moneys in the Tax Fund to make such payments. Under existing law, no moneys may be released from the Tax Fund unless all required amounts have been appropriated and all currently due payments have been made to the Corporation. If all *604 required amounts have been appropriated and all currently due payments have been made to the Corporation, then at the end of the State’s fiscal year, the Comptroller is required to pay all remaining moneys in the Tax Fund to the General Fund of the State — otherwise the moneys must remain in the Tax Fund, unavailable for use by the State.
THE LAW
The provisions of the New York State Constitution implicated in the merits of this proceeding are the following: article VII, § 8; article VII, § 11; and article X, § 5. Further implicated in the merits of this proceeding is article 7-A, § 123-b (1) of the State Finance Law.
STANDING
However, before we get to the merits, the court must first decide the issue of the "standing” of the plaintiffs to maintain this action.
Uniquely, this issue, under the circumstances of this case, is not one of first impression, but has been ruled upon by the Court of Appeals in Wein v Comptroller of State of N. Y. (46 NY2d 394).
Conceptually, "standing” can arise under common law (where one is personally aggrieved and has a personal right to vindicate, as against a general right as a member of a general class such as a citizen-taxpayer), or under the principle of Boryszewski v Brydges (37 NY2d 361, 364), where "standing” was extended to permit a citizen-taxpayer to challenge the constitutionality of an expenditure measure as distinguished from a revenue measure, where "the failure to accord such standing would be in effect to erect an impenetrable barrier to any judicial scrutiny of legislative action.”
Plaintiffs also claim a constitutional right of standing. In that connection plaintiffs attack as unconstitutional the exception set forth in section 123-b (1) of the State Finance Law denying citizen-taxpayers standing to attack as unconstitutional, revenue-raising measures involving the "authorization, sale, execution or delivery of a bond issue or notes issued in anticipation thereof by the state or any agency, instrumental *605 ity or subdivision thereof or by any public corporation or public benefit corporation.”[2]
In Wein v Comptroller of State of N. Y. (46 NY2d 394, supra), the Court of Appeals held not only that there was no constitutional right to "standing”, but that the exception contained in section 123-b (1) of the State Finance Law, even though it did not, in so many words, prohibit a lawsuit respecting the subject matter involved, was a valid expression of legislative policy to that end, which the courts must respect, and thus it would be inappropriate for the courts to confer standing in such cases. Accordingly, in the instant case, involving an attack on a legislative revenue-raising measure respecting the issuance of bonds by the Local Government Assistance Corporation, a public benefit corporation, plaintiffs lack "standing” to maintain said action. (See also, New York State Coalition for Criminal Justice v Coughlin, 64 NY2d 660;[3] cf., Wein v Comptroller of State of N. Y., 46 NY2d 394, 397, n, supra [stating: "It may be that in an extraordinary case a taxpayer’s standing may itself rise to a level of a constitutional right (cf. Wein v Carey, 41 NY2d 498, 502, supra). ”].)
CONSTITUTIONALITY
Ordinarily this would be the end of the case and the complaint would be dismissed for lack of standing, without reaching the merits. However, inasmuch as the issue of standing appears to be such an amorphous one, depending on the circumstances, and the monetary amounts involved herein being of such astronomical proportions — a total of $4.7 billion *606 bonds ultimately to be issued; approximately $2.4 billion already issued; and approximately $450 million to be issued in several days, upon the strength of this decision — it appears fitting and proper for the court to reach the merits of the substantive issues involved.
Once again, uniquely, the substantive issues of this case are not issues of first impression.
While plaintiffs wax eloquent in extolling their philosophical outlook respecting the complex issues of this case, and urge the court to adopt the minority view expressed in Wein v City of New York (36 NY2d 610 [Wein I]), a 4-3 decision of the Court of Appeals, it must be noted that for a Supreme Court Justice the dominant philosophical principle is that where the Court of Appeals has spoken in a 4-3 decision, the "fours” have it! If there is to be a change of view from that expressed in an earlier decision of the Court of Appeals, it is for the Court of Appeals to first express that new view; until then the lower court is bound by what the appellate court has in fact said, not what the individual lower court Justice hopes the appellate court will say in futuro.
The resolution of the substantive constitutional issues relied upon by plaintiffs herein is governed by the holdings made by the Court of Appeals in Wein v City of New York (36 NY2d 610, supra [Wein I]).
Article VII, § 11 of the NY Constitution reads in pertinent part: "no debt shall be hereafter contracted by or in behalf of the state, unless such debt shall be authorized by law, for some single work or purpose, to be distinctly specified therein. No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election”.
Article VII, § 8 (1) of the NY Constitution reads in pertinent part: "nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking”.
Article X, § 5 of the NY Constitution reads in pertinent part: "Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof’.
*607 The legislation creating the New York Local Government Assistance Corporation was specifically and intentionally based upon the legislation creating the New York City Stabilization Reserve Corporation (SRC), upheld in Wein I (supra).
Both SRC and LGAC were created by the Legislature to provide revenues to local governments. The SRC Act (Public Authorities Law § 2530 et seq.), and the LGAC Act (Public Authorities Law § 3231 et seq) respectively established the SRC and LGAC, as corporate governmental entities constituting public benefit corporations. Each entity is empowered to issue bonds and notes to accomplish its corporate purposes (SRC Act, Public Authorities Law § 2535; LGAC Act, Public Authorities Law § 3235). Neither the State nor the city was liable on SRC’s bonds or other indebtedness (Public Authorities Law § 2542); neither the State nor any local government is liable on LGAC’s bonds or other indebtedness (Public Authorities Law § 3242). Bonds of both SRC and LGAC are payable solely from the funds of the respective corporations (Public Authorities Law §§2542, 3242). Each corporation is authorized to issue bonds in an amount not in excess of their respective statutory limitation (Public Authorities Law §§ 2536, 3236).
At issue in Wein I (supra) was whether SRC bonds constituted debt of New York City in violation of the State Constitution; the Court of Appeals held unequivocally that they did not, but constituted debt solely of SRC. The parallel with LGAC is irrefutable.
SRC, upon certification by the Mayor of the City of New York, was authorized to issue its indebtedness up to the statutorily prescribed limitation and pay its bond/note proceeds to the city (Public Authorities Law § 2538); likewise, LGAC, upon appropriations enacted by the New York State Legislature providing for the amount and manner of payments to local governments, is authorized to issue and sell its bonds and make payments to local governments from the next proceeds thereof, for certain specified governmental purposes —including elementary and secondary education, community college aid, tuition assistance program support, revenue-sharing assistance, certain health and environmental improvement aid, and other public purposes (Public Authorities Law § 3238).
Most importantly, both the SRC Act and the LGAC Act provide specifically that the bonds and notes of each corpora *608 tian are not obligations of the State, nor in the case of SRC, of New York City. No LGAC or SRC bondholder has any claim against the State or local government for payment on a bond, unlike the holder of a general obligation bond of the State. (See also, NY Const, art X, § 5.) Indeed, the LGAC legislation, in Public Authorities Law § 3242, specifically provides as follows:
"§3242. State and local governments not liable on bonds and notes
"The notes, bonds or other obligations of the corporation shall not be a debt of the state or of any local government, and neither the state nor any local government shall be liable thereon, nor shall they be payable out of any funds other than those of the corporation; and such bonds and notes shall contain on the face thereof a statement to such effect.”
In addition, similar to the requirements of the SRC Act, all of the provisions which relate to any payments by the State are executory and subject to appropriation from year to year. Public Authorities Law § 3240 (5) provides: "The agreement of the state contained in this section shall be deemed executory only to the extent of appropriations available for payments under this section and no liability on account of any such payment shall be incurred by the state beyond such appropriations. The state, acting through the director of the budget, and the corporation may enter into, amend, modify, or rescind one or more agreements providing for the specific manner, timing, and amount of payments to be made under this section, but only in conformity with this section.”
The statutory structure, pursuant to which LGAC receives payments from the State, subject to annual appropriations by the Legislature, was approved by the Court of Appeals not only in Wein I (36 NY2d 610, supra) but also in Wein v State of New York (39 NY2d 136 [1976] [known as Wein II]), and in Quirk v Municipal Assistance Corp. (41 NY2d 644 [1977]), cases which approved payments to the Municipal Assistance Corporation for the City of New York (known as MAC), the successor public benefit corporation to SRC, as well as a statutory allocation of particular sales taxes to MAC.
As previously set forth in the section herein dealing with the modus operand! of LGAC, once again it is noted that LGAC bonds are not obligations of the State, but payable out of annual appropriations by the Legislature, from and only from (1) payments received by the Corporation from revenues *609 derived from certain sales and compensating use taxes imposed by the State on a State-wide basis, and required by statute to be deposited in the Local Government Assistance Tax Fund created by the LGAC Act; and (2) other moneys pledged under the respective bonding resolutions, including amounts on deposit in, and earned on investment of, a Capital Reserve Fund established pursuant to the LGAC Act. Similarly, MAC bonds are payable from payments received by MAC, subject to appropriation, from revenues derived from a special sales tax imposed by the State of New York on New York City from the Stock Transfer Tax, and from the set-aside of certain State aid to New York City. SRC obligations were similarly payable from payments received by SRC from New York City, within appropriations available therefor, and from SRC revenues derived from the Stock Transfer Tax and from set-asides of certain State aid to New York City. Like SRC, LGAC pays bond proceeds directly to local governments and not to the General Fund of the State. Lastly, LGAC, SRC, and MAC are each required by legislation to maintain reserve funds at specified levels that are to be replenished, upon certification by their respective chairperson, from specified available funding sources.
In the above-mentioned cases, the Court of Appeals held that the statutory structure and modus operand! of fiscal statutes similar to the LGAC Act neither created a debt of the State in violation of article VII, § 11 of the NY Constitution, or its counterpart respecting municipal finance, nor constituted the giving or lending of the credit of the State "to or in aid of any individual, or public or private corporation or association, or private undertaking”, in violation of article VII, § 8 (1) of the NY Constitution, nor imposed any liability upon the State or any political subdivision for the payment of any obligations issued by a public corporation, nor required the Legislature to accept, authorize acceptance of or impose such liability upon the State or any political subdivision, in violation of article X, §5 of the NY Constitution. (See also, Wein v Levitt, 42 NY2d 300 [1977]; New York State Coalition for Criminal Justice v Coughlin, 103 AD2d 40 [3d Dept 1984], affd on other grounds 64 NY2d 660 [1984], supra.)
In New York State Coalition for Criminal Justice v Coughlin (103 AD2d, supra, at 46), the Appellate Division, citing Wein v Levitt (42 NY2d 300, 304, supra), stated: "debts, whether contingent or fixed, paid out of current appropriations in the State’s general fund, replenished by the collection of taxes and *610 which are necessary for the ongoing business of State government, are not subject to a challenge under section 11 of article VII of the State Constitution.”
In Hotel Dorset v Trust for Cultural Resources (46 NY2d 358, 369, 378 [1978]), the Court of Appeals pronounced: "Courts are required to exercise a large measure of restraint when considering highly intricate and imaginative schemes for public financing or for public expenditures designed to be in the public interest. Some may be highly controversial. But when a court reviews such a decision, it must operate on the rule that it may not substitute its judgment for that of the body which made the decision. Judges, however much they might disagree with the wisdom of the act under review, are not free to invalidate it on that ground (Matter of Malpica-Orsini, 36 NY2d 568, 570, 571). It is appropriate to here quote from Wein v City of New York (36 NY2d 610, 619-620): 'Where, as here, the statutory scheme stays within the letter of the Constitution * * * then we should heed Judge Desmond’s statement in Comerski (308 NY 248, 254, supra) that "We should not strain ourselves to find illegality in such programs. The problems of a modern city can never be solved unless arrangements like these * * * are upheld, unless they are patently illegal. Surely such devices, no longer novel, are not more suspect now than they were twenty years ago when, in Robertson v. Zimmerman (268 NY 52, 62) we rejected a charge that this was a mere evasion of constitutional debt limitations, etc. Our answer was this (p 65): 'Since the city cannot itself meet the requirements of the situation, the only alternative is for the State, in the exercise of its police power, to provide a method of constructing the improvements and of financing their cost.’ ” ’ ”
There is an exceedingly strong presumption of constitutionality which attaches to legislative enactment. This presumption is "so strong as to demand of those who attack them a demonstration of invalidity beyond a reasonable doubt, and the courts strike them down only as a last unavoidable result”. (Matter of Van Berkel v Power; 16 NY2d 37, 40 [1965]; see also, Montgomery v Daniels, 38 NY2d 41.) Plaintiffs have failed to satisfy this standard!
LACHES
The essential element of loches is delay prejudicial to the opposing party. (New York Pub. Interest Research Groups v *611 Levitt, 62 AD2d 1074, 1075-1076 [3d Dept 1978], appeal dismissed 46 NY2d 849 [1979].) In Matter of Eberhart v La Pilar Realty Co. (45 AD2d 679 [1st Dept 1974]) and Finn v Morgan Is. Estates (283 App Div 1105 [2d Dept 1954]), delays of less than a year were held sufficient to establish loches.
In Bums v Egan (117 AD2d 38 [3d Dept 1986]), a case fairly analogous to the instant case, the court held that because of their delay in prosecuting their claims as voters, loches barred petitioners from challenging the Prison Bond Act.
In New York Pub. Interest Research Groups v Levitt (supra, at 1076), the Appellate Division, Third Department, found loches where the plaintiffs had waited 21 months from the execution of the leases, on which they asserted standing, to challenge the South Mall agreements. A six-month delay was held not "allowable” in Matter of General Bldg. Contrs. v Egan (106 AD2d 688 [3d Dept 1984]).
In Solnick v Whalen (49 NY2d 224 [1980]), the Court of Appeals expounded on the harm caused the State and local governments from delay in challenging governmental financing plans. The court approved a short Statute of Limitations for challenging Medicaid reimbursement rates, stating: "Of special significance in the present instance is the impact on State and local budgetary planning which application of a six-year Statute of Limitations would introduce. One can visualize the fiscal complexity which would ensue if financial planning for a program with the broad ramifications of Medicaid were subjected to individual challenges for a period of up to six years.” (Supra, at 232.)
The same reasoning prevails here. While the total LGAC bond authorization of $4.7 billion has not yet been all issued and sold, a ruling of unconstitutionality would seriously and deleteriously affect the interest of the bondholders who, in good faith, have already purchased, according to the complaint, $2.4 billion, and would undo the carefully crafted and presumptively constitutional, fiscal plan of the State to provide fiscal assistance to local government.
CONCLUSION
Accordingly, there being no issues of fact for resolution at trial, and for all the reasons heretofore stated, the motion of plaintiffs for summary judgment is in all respects denied, and the motion of defendants for summary judgment is in all respects granted. Judgment is granted to defendants declaring *612 the provisions of sections 1, 2, 3 and 10 of Laws of 1990 (ch 220), as amended by Laws of 1990 (ch 946) and Laws of 1991 (ch 2), which established, effective June 11, 1990, the New York Local Government Assistance Corporation, a public benefit corporation of the State of New York, and section 123-b (1) of article 7-A of the State Finance Law, in all respects constitutional. The complaint of plaintiffs is accordingly dismissed.[4]

. Source: Public Authorities Law, article 10-B, title 4, §§ 3231-3249; Official Statement of the New York Local Government Assistance Corporation.

. Specifically, section 123-b (1) of the State Finance Law reads as follows:
"Action for declaratory and equitable relief
"1. Notwithstanding any inconsistent provision of law, any person, who is a citizen taxpayer, whether or not such person is or may be affected or specifically aggrieved by the activity herein referred to, may maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state who in the course of his or her duties has caused, is now causing, or is about to cause a wrongful expenditure, misappropriation, misapplication, or any other illegal or unconstitutional disbursement of state funds or state property, except that the provisions of this subdivision shall not apply to the authorization, sale, execution or delivery of a bond issue or notes issued in anticipation thereof by the state or any agency, instrumentality or subdivision thereof or by any public corporation or public benefit corporation.”

. Involving issuance of bonds for prison construction by the State Urban Development Corporation pursuant to the Prison Construction Act (L 1983, ch 56).

. The amended decision herein does not require a change in the order, dated March 4, 1992, entered on the original decision of March 3, 1992; accordingly, that order shall be deemed the order entered on this amended decision, and no further order shall be required.