OPINION OF THE COURT
Bellacosa, J.
In these cases, a group of citizens challenges State financing schemes embodied in chapter 190 (Schulz Appeal No. 1) and chapter 220 (Schulz Appeal No. 2) of the Laws of 1990. The lawsuits have failed up to now for lack of threshold standing to sue. Appellants advance several theories to support their standing to sue on discrete aspects of the lawsuits, and argue on the merits that the various public financing statutes violate provisions of the New York State Constitution pertaining to how the State may incur debt. We conclude that the appellants in Schulz Appeal No. 1 should be accorded *343 standing only on a constitutional voter basis. However, we affirm the order of the Appellate Division in that appeal on the sole ground of laches. In Schulz Appeal No. 2, we dismiss the appeal for lack of a preserved substantial constitutional question.*
L
Supreme Court dismissed those portions of the pleading challenging sections of chapter 190 of the Laws of 1990 (the Act) which deal with the extension of State credit and long-term debt without voter approval. The dismissal was predicated on the authority of State Finance Law § 123-b, New York State Coalition for Criminal Justice v Coughlin (64 NY2d 660) and Wein v Comptroller of State of N. Y. (46 NY2d 394). In particular, the challenges to sections 349 and 356, as well as portions of sections 339, 342 and 371 of chapter 190, were dismissed. The Supreme Court, however, found that "the remaining statutory provisions challenged by the petitioners do not address the 'authorization, sale, execution or delivery of a bond issue’ [State Finance Law § 123-b] and petitioners do not seek to litigate that issue”.
On the State defendants’ appeal to the Appellate Division, that Court reversed, finding that the challenges to all sections of the Act were interrelated and could not be effectively separated, since they "all stem from the initial issuance of the bonds in question”. For standing purposes analysis only, we likewise treat those aspects as interrelated. The Appellate Division on that basis dismissed the entire proceeding (Matter of Schulz v State of New York, 180 AD2d 42, 44). Appellants in Schulz Appeal No. 1 appeal from that Appellate Division order as of right on constitutional grounds (CPLR 5601 [b] [1]). The claim to standing as voters is expressly asserted in their primary pleading in this proceeding. The challengers asserted that they are registered voters and that they "have standing to maintain this action as voters who have been denied their right to vote in a referendum[ ] submitted to the people at a general election pursuant to Section 11 of Article VII of the State Constitution”.
*344 The challenge in the proceeding underlying Schulz Appeal No. 2 sought to invalidate various sections of chapter 220 of the Laws of 1990 establishing the New York Local Government Assistance Corporation for the issuance of $4.7 billion in bonds. Both lower courts dismissed that proceeding outright on lack of standing. Significantly, plaintiffs in this case failed to allege their voter status as an express theory of standing in their pleadings in that case. The appeal from the Appellate Division order in that matter is also taken as of right on constitutional grounds (CPLR 5601 [b] [1]).
Because appellants in Schulz Appeal No. 1 asserted at the first opportunity in the pleadings their standing as voters pursuant to New York Constitution, article VII, § 11 that precise claim is preserved with respect to the order of the Appellate Division stemming from the State defendants’ appeal in that Court and the appeal from that order lies as of right. Because plaintiffs did not expressly allege voter standing in the proceeding underlying Schulz Appeal No. 2, no substantial constitutional question is presented and we thus dismiss that appeal and deny the motion for leave to appeal made at oral argument.
IL
Schulz Appeal No. 1 to this Court, properly before us, requires us to decide the standing-to-sue issue in the context of the challenge to various sections of chapter 190 of the State Laws of 1990. The Appellate Division dismissed that lawsuit in its entirety. The Act provides for the sale and leaseback of Attica Correctional Facility and Interstate Highway 287 by the State to a State-created public corporation. These sales were designed to generate $200 million and $30 million cash, respectively, as nonrecurring revenues, so called "one shots”. The purchases were financed by bond issues of the Urban Development Corporation during the fiscal year 1990-1991. The appraisal of the standing issue presents a difficult and complicated question which is affected by weighty precedential and statutory factors.
Until 1976, this Court consistently "held that the constitutionality of a State statute may be tested only by one personally aggrieved thereby, and then only if the determination of the grievance requires a determination of constitutionality” (St. Clair v Yonkers Raceway, 13 NY2d 72, 76, cert denied 375 US 970). In Boryszewski v Brydges (37 NY2d 361), this Court *345 loosened the reins, stating: "We hold today that a taxpayer has standing to challenge enactments of our State Legislature as contrary to the mandates of our State Constitution” (id., at 362 [emphasis added]). The rationale for the expansive turnabout is simple, critical and compelling:
"We are satisfied that the time has now come when the judicially formulated restriction on standing (which we recognize has had a venerable existence) should be modified to bring our State’s practice with respect to review of State legislative action into conformity not only with the practice in the majority of other States but also with the procedural standing of taxpayers to challenge local actions (General Municipal Law, § 51). We are now prepared to recognize standing where, as in the present case, the failure to accord such standing would be in effect to erect an impenetrable barrier to any judicial scrutiny of legislative action. In the present instance it must be considered unlikely that the officials of State government who would otherwise be the only ones having standing to seek review would vigorously attack legislation under which each is or may be a personal beneficiary” (id., at 364).
Part of the issue today is whether our precedents and legislation after Boryszewski reversed its forward thrust with respect to these public financing challenges. More precisely, the question is whether "voters” may be turned out of court when they have been denied access to the voting booth in alleged violation of an express referendum right conferred by the New York Constitution. To draw from the key language of Boryszewski, should the Executive and Legislative Branches, with the support of our subsequent standing cases, be allowed to erect "an impenetrable barrier to any judicial scrutiny of legislative action[s]” which are alleged to have violated the highest organ of law, the State Constitution itself? We conclude not. History and sound checks-and-balances principles of governance recognize the People as the source of all governmental power. Because the express voter referendum requirement to incur debt contained in article VII, § 11 is inextricably linked to the constitutional grant of debt-incurring authority, we determine that voter standing should be recognized in the proceeding culminating in Schulz Appeal No. 1.
*346 The general constitutional authorization to contract public debt and, likewise, the referendum core of the constitutional limitation on the exercise of that power are contained in article VII, § 11 of the New York Constitution. That section commands essentially that the State may borrow money only when a majority of the voters at a general election approve. The history of State finances and of the State Constitution provide clear evidence of the purport behind these provisions: Public indebtedness is viewed skeptically by the People of New York and must be tightly circumscribed by the People themselves and not entrusted finally even to their elected representatives. The constitutional prerequisite of a public referendum was considered the most effective way to avoid the "over-burdening of future generations by the incurring of long-term debt for capital improvements” (Wein v Levitt, 42 NY2d 300, 304). A similar skepticism applies to borrowing by long-term debt to pay ordinary operating expenses of the government. The People of New York enacted this constitutional provision because history had shown them the governmental officials of the day are often tempted to borrow against the future under circumstances in which the electorate itself needs to exert the ultimate, prudent check-and-balance (see generally, Wein v State of New York, 39 NY2d 136, 141-145; see also, Newell v People ex rel. Phelps, 7 NY 9 [1852]; Bergan, The History of the New York Court of Appeals, 1847-1932, 53 [1985]).
Serious concerns accompany a complete cloak of immunity that would preclude access to judicial review of challenged public financing schemes. Extension of the "taxpayer” standing limitations, to the extent urged by the State here (see, State Finance Law § 123-b; New York State Coalition for Criminal Justice v Coughlin, 64 NY2d 660, supra; Wein v Comptroller of State of N. Y., 46 NY2d 394, supra), logically and practically confers on the Legislature and Executive the power never again to submit their long-term debt financing schemes to the voters. The core provision of article VII, § 11, directing a voters’ constitutional referendum as protection against imprudent public financing, would be rendered not just moribund but dead. Since that protection emanates from the People and reserves that ultimate check to themselves, we cannot allow that right to become a dead letter, a mere set of hollow words.
The State defendants strongly counter, however, with the argument that the interests of "taxpayers” and "voters” in *347 participating in the control of excessive or imprudent government debt are logically and virtually identical. Since our own precedents, Wein v Comptroller of State of N. Y. (46 NY2d 394, supra) and New York State Coalition for Criminal Justice v Coughlin (64 NY2d 660, supra), bar "taxpayer” standing to challenge the issuance of bonds or bond anticipation notes, and State Finance Law § 123-b does not explicitly accord standing to taxpayers in such instances, the State contends that "voter” standing in this case is unavailable. In sum, the State’s position is that, driven inexorably by the force of the cited authorities, the right to vote on a debt referendum pursuant to article VII, § 11 does not allow for separate and independent standing to sue. We disagree, and note that to the extent that Wein v Comptroller of State of N. Y. (supra), New York State Coalition for Criminal Justice v Coughlin (supra) and State Finance Law § 123-b have been read as a total ban on standing in such cases, they should not be followed, at least with respect to voter standing to sue on financing schemes subject to voter referendum approval.
IIL
In Schulz Appeal No. 1, since the appeal lies and the challengers enjoy constitutional voter standing, we would ordinarily turn next to the merits. However, another distinct threshold procedural issue commands our attention — the applicability of the equitable doctrine of laches. Indeed, because of the disposition of the case up to now on lack of standing only, the lower courts did not address the merits of appellants’ fiscal challenges and the State has not argued the merits in its briefs to this Court.
The laches hurdle is necessarily implicated. Appellants assert that they started their lawsuit within one year of the enactment of the enabling legislation, within one year of the adoption of the budget for the pertinent fiscal year, within 60 days of the actual sales of bonds, within one month of learning from newspapers about the State’s actions, and prior to the adoption of the next annual budget. They insist that should be prompt enough to avoid the laches bar.
Those time periods, however, do not in and of themselves resolve this issue. We must examine and explore the nature and subject matter of the particular controversy, its context and the reliance and prejudicial impact on defendants and others materially affected. Broadly stated, the profound desta *348 bilizing and prejudicial effects from delay may be decisive factors. These considerations must be examined for their impact on the State, on the operation and maintenance of orderly government, on those with whom the State engaged in these multimillion dollar financing transactions, and on society in general.
Turning then with further particularity to the application of the laches doctrine in this case, we note that this Court has said:
"Laches is defined as 'such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.’ * * * The essential element of this equitable defense is delay prejudicial to the opposing party” (Matter of Barabash, 31 NY2d 76, 81).
Because the effect of delay on the adverse party may be crucial, delays of even under a year have been held sufficient to establish laches (see, Matter of Eberhart v La Pilar Realty Co., 45 AD2d 679; Finn v Morgan Is. Estates, 283 App Div 1105).
Chapter 190 of the Laws of 1990 was signed into law on May 25, 1990. The pertinent action attacking that enactment was not commenced until April 29, 1991. During that time, the challenged financing plans were transacted in reliance on the presumed constitutionality and regularity of chapter 190. A total of $377,326,674 in bonds were issued and sold to investors. The sales of Attica Correctional Facility and Interstate Highway 287 were completed, various other nonbond transactions were also carried out, and proceeds of $200 million and $20 million, respectively, were deposited in the Capital Projects Fund and General Fund.
Appellants’ demand for relief on the merits of their constitutional challenge would have the bonds recalled and refunded and the nonbond transactions nullified. Metaphorically, the impossibility of putting genies back in their bottles springs to the imagination. Realistically, constitutional challenges to public financing of such massive and profound dimension, possibly causing traumatic disturbance to settled matters of public finances and governance, should be undertaken reasonably promptly. To relax this procedural safeguard could disproportionately incur or threaten a greater harm to *349 the public weal than the alleged constitutional transgression itself. Undoing such closed financial transactions would also add hundreds of millions of dollars of unplanned expenditures to the taxpayers’ burdens. In sum, fiscal year 1990-1991 has come and gone and its financial books in this respect have been closed. Equitable considerations of time, in the laches sense, may justifiably keep them closed and do not warrant, in the circumstances presented here, a piecemeal invalidation challenge as suggested (dissenting opn, at 353).
We find persuasive support in both New York Pub. Interest Research Groups v Levitt (62 AD2d 1074, appeal dismissed 46 NY2d 849) and Burns v Egan (117 AD2d 38, appeal dismissed 68 NY2d 806, Iv denied 69 NY2d 602). In both cases, the Appellate Division held that the sale of bonds during the period of delay constituted an important element of the prejudice which warranted application of the doctrine of laches. That is true in this case as well.
In another relevant though different context, this Court addressed the prejudice to State and local governments that occurs when challenges to State financing plans are delayed. The Court, in applying the legal limitations bar, a four-month Statute of Limitations for challenging Medicaid reimbursement rates, stated:
"Of special significance in the present instance is the impact on State and local budgetary planning which application of a six-year Statute of Limitations would introduce. One can visualize the fiscal complexity which would ensue if financial planning for a program with the broad ramifications of Medicaid were subjected to individual challenges for a period of up to six years” (Solnick v Whalen, 49 NY2d 224, 232).
We are unanimous that the pertinent constitutional right should be subject to judicial and popular scrutiny. In contrast to our dissenting colleague, however, we conclude that judicial review may be undertaken only upon a proper and timely invocation, including satisfaction of equitable laches prerequisites in the context of the particular dispute. Only then can alleged constitutional transgressions be addressed and remedied on the merits (see, e.g., Flushing Natl. Bank v Municipal Assistance Corp., 40 NY2d 731, 1088, 1094). The State defendants’ arguments persuade us that the time periods involved here do not meet the threshold test in light *350 of the great prejudice certain to be inflicted on the State and its citizens at large when financial transactions of such magnitude and destabilizing impact are at stake and may be upset. Time must be of the essence and here appellants, for all their good-faith intentions in acting expeditiously as pro se litigants, did not satisfy that essential ingredient.
Because laches blocks our review of any of the substantive objections from appellants in this case, we emphasize that no inferences should be speculated upon or drawn as to the merits. Our references to any of the merits arguments, and to the history and the nature of the controversy, pertain solely and necessarily to our contextual consideration and application of the standing and laches doctrines. Notably, inasmuch as standing will now be available to voters, cases may develop in due time in which the courts will have to grapple and come to terms with the merits. We conclude that the time has not come here. So that there should be no misunderstanding or misdirection in view of the dissenting expression, prudence also dictates that we note that this case and our standing precedents, even to the extent expanded today, do not constitute implied endorsements or condemnations of the merits of any of the financing mechanisms that have been the subjects of challenge (see, e.g., New York State Coalition for Criminal Justice v Coughlin, 64 NY2d 660, supra; Wein v Comptroller of State of N. Y., 46 NY2d 394, supra). The Court today says and implies nothing about the constitutionality or merits of these financing mechanisms. Such questions remain open to substantive review and resolution in future cases.
Accordingly, the order of the Appellate Division should be affirmed, without costs, in Schulz Appeal No. 1 on the sole ground that the commencement of the litigation does not satisfy the equitable laches doctrine in the particular context and circumstances of the case. In Schulz Appeal No. 2, the appeal should be dismissed, without costs, on the ground that a preserved substantial constitutional question is not directly involved and the motion for leave to appeal should be denied.

 Despite the Court’s dismissal of Schulz Appeal No. 2, the dissent nevertheless addresses a threshold preservation concern that is of no moment, because if that appeal did lie, the result in the case would be the same as the one the Court reaches in Schulz Appeal No. 1, i.e., affirmance on laches only.