[—— NYS2d ——]

ROBERT L. SCHULZ et al., Appellants, v STATE OF NEW YORK et al., Respondents.

Third Department, October 21, 1993

**APPEARANCES OF COUNSEL**

*Robert L. Schulz,* Glens Falls, appellant *pro se.*

*Robert Abrams, Attorney-General,* Albany *(Frank K. Walsh* and *Peter H. Schiff* of counsel), for State of New York and others, respondents.

*Mudge, Rose, Guthrie Alexander & Ferdon,* New York City *(Douglas M. Parker* and *Arthur F. McMahon, Jr.,* of counsel), and *Michael A. Vaccari,* New York City, for Metropolitan Transportation Authority, respondent.

*Paul, Weiss, Rifkind, Wharton & Garrison,* New York City *(Arthur L. Liman, Allan Blumstein, Gerard E. Harper, Helen B. Kim* and *John T. Hecht* of counsel), and *Ralph J. Vecchio,* Albany *(Sharon P. O'Connor* of counsel), for New York State Thruway Authority, respondent.

*Victoria A. Graffeo,* Albany *(Judith A. Hard* and *Robert T. Farley* of counsel), for Clarence D. Rappleyea and others, *amicus curiae.*

## OPINION OF THE COURT

MAHONEY, J.

The principal issue in this appeal is whether certain moral obligation bonds constitute State debt within the meaning of NY Constitution, article VII, § 11.[1] The facts are undisputed. On April 15, 1993, the Legislature enacted by Laws of 1993 (ch 56 [hereinafter the Act]) a comprehensive, four-year $20.9 billion plan for the improvement of the State's infrastructure, namely, the State and local highways and bridges, the metropolitan mass transportation system, and the railways and aviation facilities. While funding for the work was to come partially from Federal assistance and other sources, a large sum was to come from the proceeds of bonds issued by defendants State Thruway Authority and Metropolitan Transportation Authority (hereinafter MTA). In consequence

---

1. Essentially, moral obligation debt is created when the State, through legislation, directs a public authority or other public corporation to issue bonds as a means of financing various public capital improvement projects and then, through outright gift or via a variety of long-term, nonrecourse agreements or capital leases, provides it with the requisite income to secure the bonds and make debt service payments thereon. Because the bonds are secured only by the revenue streams from the agreements or leases and not by the full faith and credit of the State, and under the terms of the leases or agreements the State has no legal obligation to appropriate money to make payments, it has no legal liability to the bondholders and effectively divests itself of all but a moral obligation to appropriate the moneys necessary to fund and secure the bonds.

thereof, the Legislature included now familiar mechanisms to ensure that the Thruway Authority and MTA had adequate assets to secure the bonds and a sufficient income stream to make subsequent debt service payments.

As regards the MTA bonds, the Act creates the MTA dedicated tax fund (hereinafter the MTA tax fund). It is funded by annual legislative appropriations from that portion of the dedicated mass transportation trust fund which represents tax revenues derived predominantly from supplemental petroleum and aviation fuel business taxes (see, Tax Law § 301-j [d]). The MTA tax fund moneys can be "pledged by [MTA] to secure and be applied to the payment of its bonds, notes or other obligations" and "used for payment of operating costs, and capital costs, including debt service" (Public Authorities Law § 1270-c [3], added by L 1993, ch 56, § 7). While the legislation further provides it to be "the intent of the governor to submit and the legislature to enact" a budget bill for each fiscal year, up to and including the 1996-1997 fiscal year, containing appropriations from the dedicated mass transportation trust fund to the MTA tax fund (State Finance Law § 89-c [3], as amended by L 1993, ch 56, § 10), the appropriation is in the form of a gift of certain tax revenues and is backed up by no legal obligation (State Finance Law § 89-c [3]).

With respect to the Thruway Authority, the Act authorizes that entity to issue bonds at the State's request to finance three types of capital improvements: (1) local highways and bridges, (2) State highways and bridges, and (3) railway and aviation projects. The local highway and bridge bonds are to be secured by the moneys due and owing under service contracts to be entered into between defendant Director of the Division of the Budget and the Thruway Authority (Public Authorities Law § 380 [1] [a]). These service contracts, in turn, must "provide for state commitments to provide annually to the thruway authority a sum or sums * * * to fund, or fund the debt service requirements" of the local highway and bridge bonds (L 1993, ch 56, § 14 [e], [g]). While payments on the service contracts derive from legislative appropriation (L 1991, ch 329, § 11 [d]), all contracts must provide that the obligation to make payment thereunder is not a debt of the State, that the contract is "executory only to the extent moneys are available", that "no liability shall be incurred by the state beyond the moneys available for the purpose", and that "such obligation is subject to annual appropriation by the

legislature" (L 1991, ch 329, § 11 [d] [ii]). The bonds themselves are expressly stated to be "special limited obligations" of the Thruway Authority secured by and payable only out of amounts appropriated by the Legislature and these bonds are to contain on their face a statement that they "shall not be deemed to be an obligation of the state and that the state shall not be liable thereon" (Public Authorities Law § 380 [1] [b], [c], added by L 1991, ch 329, § 12).

The State highway and bridge bonds work in a similar fashion, the only difference being the substitution of sale/leaseback arrangements in place of service contracts. Under these agreements, called dedicated highway and bridge trust fund cooperative agreements, in return for the bond proceeds the State transfers title to the land and improvements upon which the work is to be done to the Thruway Authority by quitclaim deed. The Thruway Authority then leases the property back to the State via a long-term capital lease and uses the "rent" payments it receives from the State to pay debt service and other related expenses. The "rent" payments are payable solely out of moneys appropriated by the Legislature from the dedicated highway and bridge trust fund (which consists of fuel and highway use tax revenues along with the proceeds of motor vehicle registration fees), and such funds may be pledged by the Thruway Authority to secure the bonds (Public Authorities Law § 385 [1] [c], added by L 1993, ch 56, § 34). Like the service contracts, the dedicated highway and bridge trust fund cooperative agreements must contain debt and liability disclaimer provisions (Highway Law § 10-e [5], added by L 1993, ch 56, § 33), and like the local highway and bridge bonds these bonds also must contain a statement that they are not a debt of the State, the State is not liable thereon and payment cannot come from any funds other than those the Thruway Authority pledged for them (Public Authorities Law § 385 [1] [d], added by L 1993, ch 56, § 34).

The railway and aviation bonds are likewise secured and funded by the moneys provided pursuant to a service contract, lease or agreement between the Thruway Authority and various State agencies or municipalities (Public Authorities Law § 386, added by L 1993, ch 56, § 16). The content and terms of service contracts and leases and bonds are the same as those prescribed in connection with State and local highway and bridge financing (L 1993, ch 56, § 19; *see,* Public Authorities Law § 386).

Finally, in an ostensible effort to insure that a portion of

the transportation-related construction projects were obtainable by small, minority-owned and women-owned businesses, Urban Development Corporation Act (L 1968, ch 174, § 1) § 38 was enacted to permit the Urban Development Corporation to establish a revolving loan fund to provide loans or guarantees to these enterprises (L 1993, ch 56, § 40), and Public Authorities Law § 1838 was enacted creating a State bonding guarantee assistance program to assist the businesses in meeting the payment and/or performance bonding requirements by providing the financial backing needed to induce a surety company to issue construction project bonds (L 1993, ch 56, § 39).

Contending that the foregoing, because it all involves use of legislative appropriations from the general fund or other funds comprised predominantly, if not exclusively, of taxpayer revenue to secure debt, pay debt and provide financial backing to private business violates (1) the NY Constitution, article VII, § 11 proscription against the State contracting debt without voter approval, (2) the NY Constitution, article VII, § 8 prohibition against giving or loaning the State's credit in aid of a public corporation or private enterprise, and (3) the NY Constitution, article X, § 5 prohibition against the State assuming liability for the payment of obligations issued by a public corporation and that the use of State taxes for debt service on bonds issued without voter approval constitutes a violation of due process under the State and Federal Constitutions, plaintiffs, all citizen taxpayers and registered voters in the State, commenced the instant action to declare the challenged provisions null and void. Following joinder of issue, all parties moved for summary judgment.

Supreme Court initially concluded that under *Matter of Schulz v State of New York* (81 NY2d 336), plaintiffs lacked standing to challenge the legislation as violative of any constitutional provision other than NY Constitution, article VII, § 11. Moreover, of the six challenges under article VII, § 11, the court further found that plaintiffs' third cause of action, challenging as unconstitutional the additional bonding for local highway and bridge improvements, was barred by laches inasmuch as the funding mechanism itself was established in 1991 (L 1991, ch 329, § 11). The remaining challenges were addressed on the merits and, upon review, found to be constitutionally sound. Supreme Court reasoned that the financing mechanisms involved were meaningfully indistinguishable from those upheld by the Court of Appeals in *Wein v City of New York* (36 NY2d 610). Accordingly, the court granted

defendants' motions for summary judgment. This appeal by plaintiffs ensued.

### PLAINTIFFS' STANDING TO SUE

■ As a threshold issue, plaintiffs contend that Supreme Court erred in concluding that they lacked standing to challenge the subject financing provisions as violative of NY Constitution, article VII, § 8 and article X, § 5. We disagree. Because plaintiffs are challenging the Legislature's authorization of bond issues, they cannot claim statutory standing pursuant to State Finance Law § 123-b. It is equally clear that they have no common-law standing as taxpayers in this situation *(see, Wein v Comptroller of State of N. Y.,* 46 NY2d 394, 399).* Moreover, while the Court of Appeals recently accorded plaintiffs standing as voters to challenge financing schemes which are claimed to be subject to voter referendum approval, holding that the right to vote contained in NY Constitution, article VII, § 11 allows for separate and independent standing to sue, neither NY Constitution, article VII, § 8 nor article X, § 5 are linked to any voting rights *(see, Matter of Schulz v State of New York,* 81 NY2d 336, *supra).* That being the case, the issue of plaintiffs' standing to maintain these challenges continues to be governed by *Wein v Comptroller of State of N. Y.* (46 NY2d 394, *supra), New York State Coalition for Criminal Justice v Coughlin* (64 NY2d 660) and our prior decision in *Schulz v State of New York* (185 AD2d 596, *appeal dismissed* and *lv denied* 81 NY2d 336, *supra),* and, under the principles enunciated therein, plaintiffs cannot proceed.

### LACHES AS BARRING PLAINTIFFS' CHALLENGES TO LOCAL HIGHWAY AND BRIDGE BOND FINANCING MECHANISMS

■ We likewise agree with Supreme Court that under the additional principles enunciated in *Matter of Schulz v State of New York* (81 NY2d 336, 347-350, *supra),* plaintiffs' third cause of action challenging the financing mechanisms for funding local highway and bridge bonds as violative of NY Constitution, article VII, § 11 is barred by laches. While the Act increases the amount of bonds the Thruway Authority is authorized to sell to finance local highway and bridge projects, the financing scheme itself, which is under attack in this cause of action, was not *created* by that legislation but rather by Laws of 1991 (ch 329, § 11). This legislation was signed into law and became effective on July 15, 1991. Plaintiffs com-

menced their action on May 28, 1993, almost *two years* after the effective date. In the interim, the Thruway Authority has issued bonds to fund the consolidated local highway assistance (hereinafter CHIPS)[2] program and the municipal streets and highways (hereinafter Marchiselli)[3] program. In reliance on these programs, the municipalities have expended funds and committed themselves to future programs with the expectation that they would be reimbursed. Quite simply, to abort these programs at this point would create severe fiscal problems and cause the same sort of disruption and prejudice which led the Court of Appeals to apply the doctrine of laches in *Matter of Schulz v State of New York* (81 NY2d 336, *supra*).

### CONSTITUTIONALITY OF THE CHALLENGED LEGISLATION

■ In resolving the constitutional issue of whether moral obligation debt of the sort challenged here is debt "contracted by or in behalf of the state" within the meaning of NY Constitution, article VII, § 11, we begin by noting not only the presumption of constitutionality which attaches to legislative enactments, but also the strength of that presumption in the area of public finance *(see, e.g., Wein v Beame,* 43 NY2d 326; *Wein v City of New York,* 36 NY2d 610, *supra).* Undoubtedly, there is a certain intrinsic validity to plaintiffs' contentions that the challenged financing schemes are little more than carefully tailored mechanisms to circumvent the referendum requirements of NY Constitution, article VII, § 11 *(see generally,* Restoring Credit and Confidence, Report of Moreland Commn on Urban Dev Corp and other State Financing Agencies, Mar. 31, 1976, at 113). Likewise, there is a disturbing correctness to their argument that while the State technically is under no legal obligation to appropriate moneys to cover the public authorities' bonds, inasmuch as the public authority would default if the State failed to make these appropria-

---

**2.** CHIPS, which began in 1982, apportions bond proceeds to municipalities to fund capital projects and operating expenses. These apportionments are made up to a year in advance so municipalities, which initially pay the nonFederal cost of the projects, can plan their fiscal affairs in anticipation of reimbursement.

**3.** The Marchiselli program provides localities with State funds to complement Federal matching grants for local capital infrastructure. In this program, like CHIPS, municipalities undertake the nonFederal cost of financing the projects in expectation of reimbursement from the State of all but about 5% of the total cost.

tions and such default would affect the State directly by impairing its credit and hampering its ability to issue bonds in the future, the State practically and economically is obligated to make payment. As such, these arrangements have all the earmarks of a long-term State obligation. Be that as it may, however, the inescapable conclusion to be drawn from a reading of applicable precedent on this subject is that such arrangements do not constitute a legal debt of the State.

Despite plaintiffs' arguments to the contrary, we agree with Supreme Court that *Wein v City of New York* (36 NY2d 610, *supra)* is dispositive of this issue. That case involved creation of the Stabilization Reserve Corporation (hereinafter SRC), which was authorized, upon certification of the Mayor of the City of New York, to issue up to $520 million in bonds and to pay the proceeds to the City Comptroller to be used in the City's general fund. The SRC was the sole obligee on the bonds and debt service was to be payable solely out of the SRC capital reserve fund. Inasmuch as the SRC had no assets or independent source of income, however, moneys in the capital reserve fund were to come from City appropriations or, in the event of the City's default, the State. Although the City and the State earmarked funds for payment into the capital reserve fund, the Court of Appeals specifically found that neither was *legally obligated* to make any appropriations to fund the SRC debt and, as such, could not be held liable to bondholders in the event of default. Over a vigorous dissent, the majority reasoned that because there was no *legal* obligation owed by the City to bondholders, the obligation did not constitute debt within the meaning of NY Constitution, article VIII, § 4.

Simply put, the lesson to be learned from *Wein v City of New York (supra)* and cases construing it *(see, Wein v Levitt,* 42 NY2d 300; *Wein v State of New York,* 39 NY2d 136; *New York State Coalition for Criminal Justice v Coughlin,* 103 AD2d 40, *affd on other grounds* 64 NY2d 660, *supra; Matter of Schulz v State of New York,* 151 Misc 2d 594, *mod* 185 AD2d 596, *appeal dismissed* and *lv denied* 81 NY2d 336, *supra; Burns v Egan,* 129 Misc 2d 130, *affd* 117 AD2d 38, *appeal dismissed* 68 NY2d 806, *lv denied* 69 NY2d 602) is that in order to constitute debt within the meaning of the State and local finance articles of the NY Constitution, the State or locality must *legally* be obligated to the bondholders in the event of default. Here, as in *Wein v City of New York (supra),* the State clearly has no legal liability either on the Thruway

Authority's State highway and bridge bonds or the railway and aviation bonds. As noted above, both are expressly denominated to be obligations of the Thruway Authority and are backed up solely by Thruway Authority revenue streams, not by the full faith and credit of the State. This lack of affirmative legal obligation effectively distinguishes this case from *Newell v People ex rel. Phelps* (7 NY 1) and other cases cited by plaintiffs.

Finally, it is now clear that there is no constitutional violation attendant to the fact that the revenue streams backing up the Thruway Authority bonds derive from State appropriations. It is well established that the State can constitutionally give or lend money to assist a municipal or other public corporation in carrying out a public purpose *(see, e.g., Wein v State of New York,* 39 NY2d 136, 140, *supra).*

WEISS, P. J., MERCURE, CARDONA and CASEY, JJ., concur.

Ordered that the judgment is affirmed, without costs.