**Earl A. PIKE, et al., Appellants,**

v.

**John GUNYOU, Commissioner of Finance of the State of Minnesota, et al., and Northwest Airlines, Inc., intervening defendant, Respondents.**

No. C2–92–734.

Court of Appeals of Minnesota.

June 20, 1992.

Review Granted Aug. 31, 1992.

Opinion Vacated Nov. 13, 1992.*

---

* Editor's Note: Opinion and concurrence vacated and declared to be of neither dispositional nor precedential value by the Minnesota Supreme Court November 13, 1992. See 1992 WL 328947.

David R. Knodell, Minneapolis, for Earl A. Pike, et al.

Hubert H. Humphrey, III, Atty. Gen., Mark B. Levinger, Christie B. Eller, Asst. Attys. Gen., St. Paul, for John Gunyou, Com'r of Finance of the State of Minn., et al.

Donald W. Selzer, Jr., Oppenheimer, Wolff & Donnelly, St. Paul, (for respondent Metropolitan Airports Comm.).

Thomas Tinkham, Warren R. Spannaus, Leslie J. Anderson, Dorsey & Whitney, Minneapolis, for Northwest Airlines, Inc.

## OPINION

WOZNIAK, Chief Judge.

This appeal was taken from the dismissal of appellants' lawsuit for failure to post a $30 million surety bond pursuant to Minn. Stat. § 562.02 (1990). Appellants argue the statute does not apply to their constitutional challenge to the validity of 1991 Minn. Laws ch. 350. In the alternative, appellants argue that the trial court abused its

discretion by requiring a bond and in establishing the amount of the bond. We affirm.

## FACTS

1991 Minn.Laws ch. 350 was signed into law on May 30, 1991. The act authorizes bonds to finance construction of aircraft maintenance and repair facilities and to provide substantial financial assistance designed "to encourage and facilitate the retention and expansion of airline corporations' facilities, operations, and services in [Minnesota]." 1991 Minn.Laws ch. 350, art. 2, § 2. Although the act does not name a particular airline, all parties agree the purpose is to benefit Northwest Airlines, which is based in Minnesota and has many employees here.

The act authorized numerous transactions, but specific negotiations were required to arrive at terms to implement the provisions of the act. Article 3 of the act established

> an interagency task force to coordinate the financial transactions authorized by [the] act, including bonds, financial assistance, and loan, lease, and other revenue agreements.

*Id.*, art. 3, § 1, subd. 1. The interagency task force held numerous public meetings on the details of the various transactions. Negotiations continued between Northwest and state officials throughout 1991.

Proposed terms were presented to the legislative commission on planning and fiscal policy in November 1991 for it to make an advisory recommendation to the commissioner of finance. The legislative commission held hearings on the proposals in November and December 1991. Until the day of its vote, there was speculation as to whether or not the commission would approve implementation of chapter 350 and, if approved, on what terms. The commission modified the Metropolitan Airport Commission's proposal to include six terms not required by chapter 350, and it reached a "clear understanding" with all parties that a certain portion of the $270,000,000 proceeds from bonds to be issued by the Metropolitan Airports Commission could be

used to prepay leveraged buy-out debt and for other (unspecified) preexisting debt and business purposes. The thrust of the agreements implementing chapter 350 was not known with certainty by appellants or others until March 29, 1992, when the final contracts were signed by Northwest, the state, and the Metropolitan Airports Commission. Bonds were to be issued on April 14, 1992, and proceeds were to be delivered to Northwest.

Appellants brought suit on April 2, 1992, four days after the contracts were signed. They allege that 1991 Minn.Laws ch. 350 is unconstitutional on its face because 1) it is a special law benefitting one corporation; 2) it does not serve a public purpose; 3) it constitutes a loan of the state's credit; 4) it includes an impermissible delegation of legislative powers to a commission; and 5) its tax credit and sales tax exemption provisions violate the state constitution's uniformity of taxation clause. In addition to these constitutional challenges, appellants also raise challenges arising from the contract terms, the commercial context, and the facts upon which the agreement was premised. Specifically, appellants allege respondents failed to comply with the statutory prerequisites for the issuance of bonds and that there is no credible evidence supporting the findings required by the statute regarding 1) the adequacy of security; 2) the likelihood that future revenues will be sufficient to pay all obligations; and 3) the fair market value of properties and international routes.

The complaint seeks a declaratory judgment that the statute is unconstitutional and a permanent injunction to prevent 1) the issuance of any bonds authorized by chapter 350; 2) the expenditure of bond proceeds for anything but repayment of principal; 3) the use of tax revenues to pay principal or interest on the bonds; 4) the allowance of tax credits and exemptions permitted by the statute; and 5) loans from the Metropolitan Airports Commission's "special construction fund."

On April 10, 1992, respondents moved the trial court, pursuant to Minn.Stat. § 562.02, for an order requiring appellants

to post a surety bond of $819 million. After a hearing, appellants were ordered to post a $30 million bond by April 14, when the first bonds authorized by chapter 350 were due to be issued. Appellants moved for reconsideration, submitting evidence that it would take at least one month to procure a bond in that amount, but they did not indicate that they would be able to provide a bond even if they were given additional time. On April 14, 1992, the trial court refused to extend the deadline and ordered that the action be dismissed with prejudice for appellants' failure to post the bond.

Appellants filed this appeal from the judgment of dismissal on April 16, 1992. We ordered expedited briefing and oral argument.

The Metropolitan Airports Commission bonds ($270 million) were sold prior to oral argument held before this court on May 6, 1992. We have not been informed of the disbursement of the proceeds, nor how the opinion of bond counsel addressed the challenge then before this court.

## ISSUES

1. Does Minn.Stat. § 562.02 (1990) apply to this action?

2. Must the trial court exercise discretion in ordering the bond under Minn.Stat. § 562.02 (1990)?

3. Does a dismissal with prejudice of this action bar a similar suit by another taxpayer?

4. Did the trial court, under the facts of this case, abuse its discretion in ordering appellants to post a bond as a condition of continuing their suit?

5. Did the trial court abuse its discretion in setting the amount of the bond and the deadline for posting?

---

**1.** We note that appellants' complaint contains no explicit allegation that their tax burden will increase as a result of the challenged statute. *But see Minnesota Fed'n of Teachers v. Randall,* 891 F.2d 1354, 1358 (8th Cir.1989) (taxpayer need not establish an increase in own tax burden, but must show that a contemplated disbursement would violate constitutional guaran-

## ANALYSIS

1. Application of Minn.Stat. § 562.02 (1990).

■ Our supreme court has held that taxpayers who allege an illegal expenditure of tax money which "will likely have the effect of increasing the over-all tax burden of the community" may bring a declaratory judgment action to challenge the constitutionality of the underlying statute. *Arens v. Village of Rogers,* 240 Minn. 386, 391–92, 61 N.W.2d 508, 513–14 (1953), *appeal dismissed,* 347 U.S. 949, 74 S.Ct. 680, 98 L.Ed. 1096 (1954); *see also St. Paul Area Chamber of Commerce v. Marzitelli,* 258 N.W.2d 585, 588 (Minn.1977) (no question that taxpayers may sue to enjoin waste or illegal use of public funds); *Almquist v. City of Biwabik,* 224 Minn. 503, 505, 28 N.W.2d 744, 745 (1947) (taxpayer directly affected by assessment).[1] However, the legislature and courts have recognized that such suits may cause costly delays in public projects. The right to sue is not unfettered, and Minn.Stat. § 562.02 (1990) may pose a significant barrier to some taxpayer suits.

"Section 562.02 was adopted in 1957 for the apparent purpose of discouraging vexatious lawsuits by irresponsible litigants." *Village of Elbow Lake v. Otter Tail Power Co.,* 281 Minn. 43, 46, 160 N.W.2d 571, 574 (1968). The statute protects taxpayers against inordinate delays in the implementation of legislative decisions by encouraging those who wish to challenge the decision of a governmental body "to commence their actions before any substantial damage will result from a delay in the prosecution of the project." *Gram v. Village of Shoreview,* 259 Minn. 145, 154, 106 N.W.2d 553, 559 (1960).

The statute at issue reads:

---

tees). While respondents argue that appellants lack standing because they have not identified a personal right or interest differing from other citizens which is threatened by the statute, this issue has not been decided by the trial court, and we decline to address it for the first time on appeal.

Whenever any action at law or in equity is brought in any court in this state questioning directly or indirectly the existence of any condition or thing precedent to, or the validity of any action taken or proposed to be taken, by any public body * * * in the course of the authorization or sale * * * of bonds [or] the making of a contract for [a] public improvement * * *, such public body may move the court for an order requiring the party * * * bringing such action to file a surety bond. * * * If the court determines that loss or damage to the public or taxpayers may result from the pendency of the action or proceeding, the court *may* require such party, or parties, to file a surety bond, which shall be approved by the court, in such amount as the court may determine. Such bond shall be conditioned for payment to the public body of any loss or damage which may be caused to the public body or taxpayers by such delay, to the extent of the penal sum of such bond, if such party, or parties, shall not prevail therein. If such surety bond is not filed within a reasonable time allowed therefor by the court, the action shall be dismissed with prejudice.

Minn.Stat. § 562.02 (emphasis added). This court has paraphrased the statute:

If an action is brought in any court to challenge the validity of a condition precedent to an act, or the act itself, of a public body in the course of authorizing, issuing, or selling bonds, or in contracting for a public improvement, the public body may seek an order requiring the party bringing the action to file a surety bond.

*In re Winona County Mun. Solid Waste Incinerator*, 439 N.W.2d 56, 57 (Minn.App. 1989).

**2.** Northwest alleges that appellants failed to question "the applicability of § 562.02" in the district court, and that the issue is improperly raised "for the first time here." In fact, the appellants' memorandum in opposition to the bond request explicitly argued that Minn.Stat. § 562.02 was inapplicable to this action. The issue was preserved, and it is properly raised in this court.

The plain language of the statute applies to this case. Appellants' suit is an "action at law or in equity" which questions "directly" the enabling legislation and the evidence supporting the findings which are conditions "precedent to" public bodies (the state and the Metropolitan Airports Commission) issuing bonds. Appellants do not allege that Minn.Stat. § 562.02 is unconstitutional. *See Gram*, 259 Minn. at 154, 106 N.W.2d at 559 (explicitly holding statute is constitutional). They urge this court to carve out an exception for constitutional challenges to enabling legislation.[2]

In *Gram*, public meetings were held before the city council agreed to proceed with a sewer project. After contracts were signed, but before bonds were issued, taxpayers brought a declaratory judgment action. The supreme court affirmed the application of Minn.Stat. § 562.02, although the bond requirement had the effect of foreclosing judicial review. In light of *Gram*, and the appellants' failure to cite any supporting language in Minn.Stat. § 562.02, case law, or legislative history supporting an exception for constitutional challenges, we cannot ignore the legislature's decision to draft the statute broadly to embrace all actions, regardless of their substantive nature. Minn.Stat. § 645.16 (1990) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."); *see also Gariup v. Stern*, 254 Ind. 563, 567, 261 N.E.2d 578, 582 (1970) (similar statute applicable to taxpayer suits raising constitutional questions).

The legislative objective of curbing vexatious suits and costly delays applies notwithstanding that the plaintiffs base their complaint on constitutional challenges.[3]

**3.** While we are deeply concerned that the broad language of the statute may have the effect of foreclosing some meritorious claims, the supreme court has held that Minn.Stat. § 562.02 is constitutional, despite that impact. *Gram*, 259 Minn. at 154, 106 N.W.2d at 559; *see also Kilowatt Org. (TKO), Inc. v. Department of Energy, Planning & Dev.*, 336 N.W.2d 529, 531 (Minn. 1983). In light of the supreme court's holdings

The trial court properly concluded that Minn.Stat. § 562.02 applies to this action.

2. Must the trial court exercise its discretion in ordering or not ordering a bond?

■ In holding that Minn.Stat. § 562.02 is constitutional, the supreme court in *Gram* noted specifically that the potentially onerous implications of the bond requirement under Minn.Stat. § 562.02 are greatly reduced because the statute is discretionary. *Gram,* 259 Minn. at 153, 106 N.W.2d at 559. The trial court's decision to require a substantial bond "shall not be overturned except for a clear abuse of discretion." *Kilowatt Org. (TKO), Inc. v. Department of Energy, Planning & Dev.,* 336 N.W.2d 529, 533 (Minn.1983) (affirming $6 million surety bond and holding litigants not denied due process, although judicial review foreclosed).

In exercising its discretion, the trial court should consider the consequences of not answering the question posed in the litigation. There will be occasions on which the public will be served by having a question raised in litigation answered at once. In this case, however, the respondents, advocates of the proposal, preferred to dispose of the pending litigation without obtaining an answer; they asserted the requirement of a bond under Minn.Stat. § 562.02 and asked that the appellants' action be dismissed. In doing so, they passed up the opportunity to get a prompt answer from the courts as to whether the appellants' challenge to chapter 350 has merit. The respondents chose to take the chance that the failure to have that answer would leave legal uncertainty as an obstacle to the issuance of bonds to implement chapter 350. In any event, the likelihood that legal uncertainty might make the bonds unsalable is no greater now than it would have been had the appellants not brought this action. And, because no decision has been made on the merits, the risk should be no less.

and the legislature's failure to revise the statute, we are constrained to apply the statute as writ-

The surety bond requirement of Minn. Stat. § 562.02 is analogous to the bond requirement in injunction cases. *Gram,* 259 Minn. at 153–54, 106 N.W.2d at 559. Even if plaintiffs in a particular case do not seek temporary injunctive relief,

the effect of the action, for all practical purposes, is the same as if a temporary injunction had been procured. The bonds * * * cannot be sold until the litigation is at an end.

*Id.* In this case, the pendency of the suit in the district court delayed the issuance of bonds until after the suit was dismissed. Although appellants did not seek temporary injunctive relief, the pendency of their suit resulted in a de facto injunction, and they have not established that the trial court abused its discretion under Minn. Stat. § 562.02 by requiring them to post security for the damages which may result from delay.

The injunctive effect may occur even if litigants bring suit at the earliest opportunity. *See TKO,* 336 N.W.2d at 532 (action brought in district court within 30 days of challenged agency decision). The focus of the statutory language is on the suit's effect upon the bond issue or public project.

If the court determines that loss or damage to the public or taxpayers may result from the pendency of the action or proceeding, the court may require such party, or parties, to file a surety bond. * * * Such bond shall be conditioned for payment to the public body of any loss or damage which may be caused to the public body or taxpayers by such delay.

Minn.Stat. § 562.02. The statute does not require a finding of bad faith or fault by the litigants. Its harsh effect is to foreclose judicial review if the issues cannot be resolved on the merits before the public suffers "any substantial damage" from the delay of a project. *Gram,* 259 Minn. at 154, 106 N.W.2d at 559; *see also TKO,* 336 N.W.2d at 533 (judicial review under the Administrative Procedure Act "conditioned upon the provisions of section 562.02").

ten.

Because the risk of damage to the public interest is the reason for a court to order a bond under section 562.02, the court must balance the hazard of project delay, on one hand, against the risk of going forward with an illegal project on the other. Balancing the alternative risks requires the court to look at the context of the transaction at issue. To look at the context requires a decision as to the effect dismissal under section 562.02 has in foreclosing an action that might subsequently be brought by another taxpayer challenging the legality of the bonds issued under chapter 350 and their enforceability against the state and its subdivisions.

3. Does dismissal of this action with prejudice bar a subsequent suit by another taxpayer asserting the same challenges?

■ Although our affirmance of the bond requirement has the effect of foreclosing judicial review of the constitutional claims presented by these appellants, all counsel agreed at oral argument that the dismissal would not bar a similar suit by another taxpayer, since the claims have not been adjudicated on the merits. *We agree, and so hold.* This determination is essential to our affirmance and, therefore, is not dicta as the concurrence would suggest.

Were the option of a later taxpayer suit not available, the discretionary decision of the trial court here would implicate a serious constitutional concern. We need not, however, face the constitutional question of foreclosing a taxpayer challenge to chapter 350 and the legality of its implementation because the ability to bring that challenge at some later time resides in other taxpayers.

The opportunity for other taxpayers to challenge the implementation of chapter 350 is necessary because the constitution must stand between the citizens and the legislature to restrain acts in excess of legislative authority. Citizens must be, and are entitled to be, protected by our courts. Our democracy rests upon the separation of powers, which depends upon the independence of the courts for its vitality,

and is nothing less than the source of our nation's strength and protection of our citizens. Taxpayers must be protected:

> In determining whether an act of the state constitutes a performance of a governmental function or a public purpose which will justify the expenditure of public money, a legislative declaration of public purpose is not always controlling. *The determination of what is and what is not a public purpose,* or the performance of a governmental function, initially is for the legislature, but *in the final analysis it must rest with the courts.*

*R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 337 (Minn.1978) (emphasis added) (citing *Visina v. Freeman,* 252 Minn. 177, 184, 89 N.W.2d 635, 643). We must not create a class of cases in which the constitutionality of statutes and the actions taken under them are not subject to judicial review. Such a result would be contrary to everything we have understood about judicial review and our tripartite system of government since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

We are guided by article I, section 8, of our constitution, which reads:

> Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws.

We thus conclude that a subsequent taxpayer suit brought by another taxpayer would not be barred by the dismissal of this action.

4. Did the trial court, under the facts of this case, abuse its discretion in ordering appellants to post a bond as a condition of continuing their suit?

■ If it is possible to minimize potential damage to the public, the trial court should exercise discretion to deny any motion to require a surety bond under Minn.Stat. § 562.02. Here, however, the potential of damage to the public interest from this action cannot be avoided.

Thus, the conclusion above that other taxpayers may assert the rights now asserted by appellants is decisive in evaluating the decision of the trial court to impose on the plaintiffs in this action the obligation of bonding. If appellants fail at this time to get a decision on their challenge to chapter 350, little damage is done to concerned taxpayers. Taxpayer interests are subject to later vindication, if meritorious, by giving other taxpayers their day in court. In contrast, there is great potential harm if appellants' claims are without merit and if their action serves as a de facto injunction. Thus, requiring a high, preclusive bond, that in other circumstances would be an abuse of discretion, is here reasonable. We therefore hold that, because of the right of taxpayers to bring a later action, the trial court did not abuse its discretion by requiring a bond in this case.

We now consider other factors relevant to the trial court's exercise of discretion.

█ As noted, the practical injunctive effect of appellants' suit gave rise to the application of Minn.Stat. § 562.02. However, the trial court also criticized appellants for "waiting" until nearly one year after adoption of chapter 350 to challenge its facial validity, indicating that the claims should have been brought earlier. In this court, appellants argue that their claims were not justiciable until the final contracts were signed, and they allege that the trial court erred in finding that the suit could have been brought earlier. Appellants' argument is credible.

Even if appellants' claims were justiciable before the action was brought, there is no requirement for citizens to decide they are offended by a government project, and to sue, until that project is complete in its shape and size. There is certainly no bar of laches in this case, although that is what the concurrence attempts to construct.[4] Any implication of laches assumes that the sole basis for the suit was an attack on the facial validity of chapter 350 which could have been brought the day after enact-

ment. In fact, the suit also challenges the findings and contracts which did not exist until shortly before the suit was brought. In the total context of the situation, it may be appropriate to impose an obligation of bond on litigants who do not bring suit at the earliest opportunity, but absent laches, they need not be held to have forfeited their access to judicial relief.

If a litigant sues as soon as the issues are justiciable, the suit may not cause substantial delay of the public project, and no bond should be required. Thus, Minn.Stat. § 562.02 may have "the salutary effect" of encouraging litigants to sue "before any substantial damage will result from a delay in the prosecution of the project." *Gram,* 259 Minn. at 154, 106 N.W.2d at 559; *see also Adelman v. Onischuk,* 271 Minn. 216, 231, 135 N.W.2d 670, 680 (1965) (person who believes that his constitutional rights are affected by statute must "raise the objection at the earliest available opportunity and exhaust the remedies which may have been provided * * * before he will be permitted to make an attack on the constitutionality of the statute"), *cert. denied,* 382 U.S. 108, 86 S.Ct. 257, 15 L.Ed.2d 192 (1965). However, assuming (without so holding) that appellants brought suit as soon as the issues were justiciable, there was ample evidence in the record that their suit was causing damages and a delay in the issuance of the bonds. *Gram,* 259 Minn. at 154, 106 N.W.2d at 559. Accordingly, Minn.Stat. § 562.02 applied.

Appellants argue that most of the claimed damages from delay could have been avoided if their proposed schedule for expedited discovery and a trial on the merits had been adopted. *See Minnesota Vikings Football Club, Inc. v. Metropolitan Council,* 289 N.W.2d 426, 429 (Minn.1979) (trial court denied motion to require surety bond under Minn.Stat. § 562.02, "presumably taking into consideration the parties' agreement to expedite the action and appeal, if any"). We agree that accelerating review on the merits could minimize the

---

**4.** We note that the court in *Schulz v. State,* 151 Misc.2d 594, 582 N.Y.S.2d 355 (N.Y.Sup.Ct. 1992), cited by the concurrence on the issue of laches, actually reached the merits of a challenge to bonds.

delay and attendant potential damages in some cases, while affording an opportunity for judicial review.

We are skeptical that the myriad constitutional and factually complex claims presented in appellants' 15–page complaint could have been prepared and tried in one month, as appellants proposed. However, not even the appellants suggested that discovery, trial, and a decision on the merits could have been obtained before April 14, 1992, when the suit would have delayed the issuance of bonds. The expedited schedule proposed by the appellants, without a bond, would not have avoided the "substantial damage" which is the focus of Minn.Stat. § 562.02. *Gram*, 259 Minn. at 154, 106 N.W.2d at 559.

■ The supreme court has sometimes emphasized the "vexatious" nature of a suit when affirming the requirement of security under Minn.Stat. § 562.02. *See, e.g., TKO*, 336 N.W.2d at 532. Presumably, a suit may be characterized as vexatious if it lacks colorable merit.

Despite the noted similarities between a motion under Minn.Stat. § 562.02 and a motion for temporary injunctive relief, Minn.Stat. § 562.02 does not require the trial court to make findings on the likelihood that plaintiffs will prevail on the merits. A plaintiff's inability to establish, prior to discovery, that he or she is certain to prevail on the merits does not require a finding that a suit is vexatious within the meaning of the statute. We note for the

record that we do not share the trial court's confidence that appellants' suit lacks merit. Appellants have raised several important and complex issues of first impression in Minnesota, inter alia.[5] While it is premature to gauge their chances of success, we cannot agree with respondents' characterization that the complaint is clearly without merit.[6]

Even if a suit has merit and a litigant is not "irresponsible" in bringing an action, a suit may be characterized as vexatious if it is duplicative of earlier review proceedings. In *TKO*, the supreme court concluded that plaintiff's suit in district court was vexatious and needlessly duplicative because it raised the same issues which had been explored "throughout" 70 days of public hearings in which the plaintiff was "intimately and steadfastly involved," and the court agreed that the policy objectives of Minn.Stat. § 562.02 were served by requiring a substantial bond. *Id.* at 531–32. In this case, there was no prior proceeding in which appellants could have raised their constitutional claims.

On the record below, the trial court expressed its opinion that the issues raised by appellants' suit had "been well ventilated in the public forums of the state." However, reliance upon the extensive legislative scrutiny which preceded adoption of chapter 350 overlooks the essential distinctions in the functions of the courts and the legislature. The legislature is the proper forum for political debate and the formulation of

---

5. Is it constitutional to lend taxpayers' money to a private corporation to finance a facility for exclusive use, operation, and control by Northwest?

Is there an illegal use of public funds because chapter 350 is a special law benefiting one private corporation?

Does paying a private corporation's pre-existing debt or general business expenses satisfy the constitutional requirement of a public purpose?

Should taxpayers (who may be in jeopardy) be forced to forego immediate court review?

What are the constitutional limits of a "loan" of the state's credit as stated in Art. XI, § 2, of the Minnesota Constitution, to wit:

The credit of the state shall not be given or loaned in aid of any individual, association or corporation except as hereinafter provided.

In view of Standard & Poor's placement of Northwest on a "credit watch," are the taxpayers adequately protected?

In short, a complete examination must be made of Minn. Const. art. XII, § 1, which states:

The legislature shall pass no * * * special law * * * granting to any private corporation, association, or individual any special or exclusive privilege, immunity, or franchise whatever or authorizing public taxation for a private purpose.

6. None of the substantive issues raised by appellants' complaint have been determined by the trial court. Although the parties have devoted portions of their briefs to the merits of these claims, these issues are not yet ripe for appellate review, and we decline to offer an advisory opinion, while acknowledging the complexity of the issues presented.

public policy, while the courts are charged with responsibility for interpreting the laws and deciding constitutional challenges. *See R.E. Short Co.*, 269 N.W.2d at 337–38 (court defers to legislature on policy issues).

■ While appellants' motives may be rooted in objections to the public policy underlying chapter 350, their complaint is framed in terms of constitutional claims. Jurisdiction to review a constitutional claim is vested in the courts. Judicial review is limited and will not duplicate the policy debates which have occurred in the legislature. *See Visina*, 252 Minn. at 184, 89 N.W.2d at 643. Review is not foreclosed, however, merely because the legislature engaged in debate before adopting a statute which is allegedly unconstitutional. We do not find that a suit is "vexatious" or needlessly duplicative merely because it challenges a statute on which public hearings were held. *TKO* should not be read so broadly. Therefore, we do not uphold the bond here on the basis of vexatiousness or duplicativeness.

We hold that the trial court did not abuse its discretion in requiring appellants to post security because their suit, brought on the eve of the bond issue, resulted in a de facto injunction which posed a risk of damages to the public and governmental entities involved.

In this case, the trial court's determination that appellants' suit would delay the issuance of bonds and construction of public improvements has assumed primary importance on appeal, and we affirm on that ground. There are no counterbalancing risks to the appellants in this circumstance because their concerns as taxpayers can be vindicated, if valid, in a suit challenging the legality and enforceability of the bonds brought after they are issued.

7. In their motion to the trial court for reconsideration, appellants requested an additional four days to obtain the bond, but they failed to indicate whether they would be able to post a $30 million bond if afforded more time.

5. The amount of the bond and deadline for posting.

Finally, appellants challenge the amount of the bond and the time allowed by the trial court to obtain the bond. However, they failed to submit evidence that they could post a bond in a lesser amount or if afforded more time.[7] The trial court must allow "a reasonable time" for the bond to be filed. Minn.Stat. § 562.02. Here, the deadline for posting was the anticipated date of the first bond issue. Under our previous reasoning, we find the trial court acted reasonably.

■ The court must consider the unrecoverable loss or damage which may be caused to the public body or taxpayers by the delay necessary to determine the merits. Specific record evidence and findings on the impact of delay upon the public improvement is essential. *Anderson v. Pearson*, 400 N.W.2d 210, 213 (Minn.App. 1987); *see also Ashenbrenner v. City of E. Grand Forks*, 257 Minn. 368, 371–72, 102 N.W.2d 28, 30 (1960) (potential loss of specific federal funding for project formed basis of bond requirement). A litigant is not responsible for speculative damages alleged to result from delay. *Village of Elbow Lake*, 281 Minn. at 46, 160 N.W.2d at 574. The court took evidence on the damages claimed by respondents, and appellants failed to submit counter affidavits or expert opinion challenging the estimates contained in respondents' affidavits. On appeal, appellants have not identified any specific error in the court's finding that the costs of delay would "exceed $30 million."

As we have previously noted, Minn.Stat. § 562.02, while extremely severe in its application, has been declared constitutional by our supreme court and we cannot ignore the legislative enactment which is clear and free from all ambiguity. We do, however, suggest that the legislature revisit and reexamine the intent and consequences of the statute as written.[8]

8. As directly and clearly stated by our supreme court:
  The Legislature is at liberty to ignore logic and perpetrate injustice so long *as it does not transgress constitutional limits.* So if the law, as it stands, results in injustice, it is for the

If we are in error as to the right to a subsequent taxpayer challenge, we err in our decision. Belief in that right is decisive to our holding that the trial court did not abuse its discretion in requiring a bond. That being so, our ruling on that question is not dicta.

We recognize the importance of retaining major employers in Minnesota. The legislature has a crucial role in the process of preserving a strong state economy. However, review does not end with the legislature. This case involves nearly $800 million of Minnesota taxpayers' cash and credit. The jobs and paychecks of thousands of citizens will be affected, directly or secondarily. As an intermediate court, we realize that the supreme court may extend further review to this matter and provide further guidance on the legal principles applied here, but we cannot avoid our responsibility to identify fully the issues presented and to encourage reasoned discussion on a case of this magnitude.

We heed the clear enunciation by our supreme court in *Davis v. Pierse,* 7 Minn. 13, 16, 7 Gil. 1, 4 (1862):

> If the state of governmental affairs were always peaceful and quiet, and legislation never attended with undue excitement, many of the restrictions imposed by constitutional governments upon legislative power might be dispensed with as unnecessary; but it is precisely because emergencies will arise, which, for the time, seem to demand or justify a resort to radical and extreme measures, that these various inhibitions are declared in the fundamental law; and, as extraordinary acts of legislation are seldom resorted to, except when the public exigencies seem to demand them, it may truly be said that these provisions are inserted in constitutions for the very purpose of meeting this plea of necessity. *Hence the greater the seeming necessity, or popular demand for such legislation, the greater the danger to be apprehended from yielding to it, and the more imperative the obligation on the*

> *part of the courts to square it rigorously by the constitution; as no act in conflict with that instrument can ever become a law, however just abstractly considered, its provisions may be; or however great and immediate the apparent necessity for such an enactment.*

(Emphasis added.)

## DECISION

The trial court correctly held that Minn. Stat. § 562.02 applies to appellants' suit and did not abuse its discretion in ordering that appellants post a bond in the amount of $30 million and failing that, dismissing the suit with prejudice.

The dismissal with prejudice of this suit does not bar a similar suit by another taxpayer, since the claims have not been adjudicated on the merits.

Affirmed.

CRIPPEN, Judge (concurring specially).

Our lawful role in this case is remarkably limited. Our only duty is to determine whether or not the trial court erred in applying Minn.Stat. § 562.02 (1990), either in choosing to impose or in formulating the amount or conditions of a surety bond. The law does not permit us to issue an advisory opinion, a "hold[ing]," on a question that is not before the court—the issue of whether in the future other taxpayers can maintain litigation on the same constitutional claims now unsuccessfully advanced by appellants.

Undoubtedly there is an ample audience for appellate court pronouncements on 1991 Minn. Laws ch. 350, the enactment that weaves a major public funding package into the financial planning of a large private business, Northwest Airlines. Countless Minnesotans have debated the merits of the legislation since it was first proposed and the intensity of public interest concerning the topic has been fueled by daily media reports on the financial health

Legislature to remove the cause. It must be done by amendment rather than construction, there being no ambiguity in the later law.

*State ex rel. Timo v. Juvenile Court,* 188 Minn. 125, 128–29, 246 N.W. 544, 546 (1933) (emphasis added).

and welfare of Northwest. So why should this court not speak to the subject?

As a matter of fundamental law, we are empowered only to decide the case before us and no level of public interest can enlarge the scope of this appeal. The deliberate choice to decide a future case exceeds our jurisdiction and casts us in a role other than that of a court of law.

Anything said on future litigation is mere dicta, the volunteered expression of personal opinions of the author. Normally, dicta is a throwaway portion of a judicial opinion—truly little noted nor long remembered.[1] In the decisionmaking process of an appellate court, colleagues of those who author extrajudicial advice normally can distance themselves from these actions in a short, separate opinion. If the court's essential holding is unanimous, a brief concurring opinion can be employed to announce agreement on the end result. In this case, however, a different degree of response must occur in light of the unusual damage done by an advisory opinion:

1. An opinion inviting future lawsuits depends on conclusions that are flawed as a matter of law. For readers who believe chapter 350 is constitutionally impaired, such an opinion is a cruel hoax, a mistaken statement that the legislation can somehow be given constitutional scrutiny at this late date.[2] For many it is bad news to learn that the time for a constitutional attack has passed, but that is an inescapable conclusion under existing Minnesota law. More particularly, this is the state of the law shaped by the provisions of Minn.Stat. § 562.02 and the Minnesota Supreme Court decision that defines its purpose (to encourage early presentation of taxpayer challenges on bond issue authorizations) and upholds its constitutionality. *Gram v. Village of Shoreview*, 259 Minn. 145, 106 N.W.2d 553 (1960).

2. Even more important, unless and until an advisory opinion inviting future lawsuits is corrected, or unless it is widely discredited by bond counsel and others in the investment community, the opinion stands as a legal cloud over all public bonds authorized by chapter 350. By broadcasting the threat of future litigation, an advisory opinion deliberately risks creating a de facto injunction prohibiting issuance and sale of these state bonds. Critics of the 1991 enactment may applaud this result, but misuse of the appellate decision-making process is never praiseworthy. None can be comforted to know that an intermediate appellate court panel can determine vital matters of law or policy by extrajudicial pronouncements on hypothetical, future cases. It has not been the experience of governance in America to find any profit or virtue in the notion that worthy ends justify unworthy means.

In sum, I respectfully disavow the notion of an advisory opinion on future lawsuits. A "hold[ing]" on another case is beyond the jurisdiction of the court, it depends on a misstatement of the law, and it injures both opponents and proponents of the Northwest financing legislation. Consistent with our limited standard of review, I write separately without stating or implying any opinion concerning the wisdom or the legality of chapter 350.

The review of law which follows is added to document conclusions already summarily stated.

### I. Scope of review

This court is not empowered to anticipate occurrence of future challenges to 1991 Minn.Laws ch. 350 and "hold" that a suit similar to appellants' lawsuit is necessary and appropriate in the future. Likewise, it

---

1. Dicta is always deserving of its own reward—simply being ignored. *See Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1662, 32 L.Ed.2d 212 (1972) (language unnecessary to decision "cannot be considered binding authority"); *State ex rel. Foster v. Naftalin,* 246 Minn. 181, 209, 74 N.W.2d 249, 266 (1956) (obiter dictum, being a statement of the judge on an issue not deliberately investigated, not entitled to the same respect as questions actually before the court and argued by counsel).

2. *Compare Nitz v. Nitz,* 456 N.W.2d 450, 452–53 (Minn.App.1990) *with Nitz v. David Nitz, Inc.,* 403 N.W.2d 652, 654 n. 3 (Minn.App.1987) (comparison of cases demonstrates the detrimental reliance which can be created by dicta inviting future lawsuits).

is not our prerogative to suggest that this future litigation is essential to our system of democracy. Nor do we have license to declare that constitutional questions raised by appellants are important and have arguable merit. Nor can we imply that taxpayers' concerns will eventually be vindicated.

It cannot be questioned that a reviewing court "must limit itself to a consideration of only those issues that * * * were presented and considered by the trial court in deciding the matter before it." *Thayer v. American Fin. Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982); *see also State ex rel. Smith v. Haveland*, 223 Minn. 89, 94, 25 N.W.2d 474, 477 (1946) (court "confined to a consideration of only those rights which are placed in issue by the pleadings"). Accordingly, a volunteered opinion concerning the viability of a future suit attacking chapter 350 is not a proper part of our review of trial court action in the proceedings at hand. This issue was never presented to the trial court and it is not part of the decision we are reviewing. In addition, none of the parties before us have raised this issue and there have been no detailed arguments presented on the topic. Rather, the only discourse on the subject occurred at oral arguments in a terse response to a question from the court that proved to be a predictor of an eventual advisory opinion.

Deliberate disregard of the necessary limitation on the scope of appellate review results in "obiter dicta:" expressions which "go beyond the facts before the court and therefore are the individual views of the author of the opinion and not binding in subsequent cases." *State ex rel. Foster v. Naftalin*, 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956).[3]

Courts have provided clear reasons for confining decisions to the case at hand and avoiding dicta. *Id.* at 209, 74 N.W.2d at

266 (observing that questions properly before the court and argued by counsel are "thoroughly investigated" and "deliberately considered"); *see United States v. Fruehauf*, 365 U.S. 146, 157, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961) (Supreme Court refuses to give opinion on issue which is not pressed before the Court because it does not have "that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect" of the issue). The dangers that accompany opinions which stray from the issues before the court have often been recognized:

> I am extremely reluctant to decide anything except what is necessary for the special case, because I believe by long experience that judgments come with far more weight and gravity when they come upon points which the Judges are bound to decide, and I believe that *obiter dicta,* like the proverbial chickens of destiny, come home to roost sooner or later in a very uncomfortable way to the Judges who have uttered them, and are a great source of embarrassment in future cases.

*Cooke v. New River Co.*, 38 Ch.D. 56, 70–71 (1888) (Bowen, L.J.), *cited in Darr v. Burford*, 339 U.S. 200, 214 n. 38, 70 S.Ct. 587, 595 n. 38, 94 L.Ed. 761 (1950); *see Opinion of the Justices*, 57 Del. 264, 269–70, 198 A.2d 687, 690 (1964) (court outlines troublesome inconsistencies between previous advisory opinions and dicta in other cases and concludes "the instant case is a clear example of the consequences flowing from unnecessary and voluntary expressions upon constitutional issues by a prior court").

It is also error to believe that simply labelling parts of an advisory opinion as a "holding" will remove the statements from the rule of obiter dictum. *See Naftalin*, 246 Minn. at 208, 74 N.W.2d at 266 (judicial expressions which go beyond the case

---

**3.** *See also McCluskey v. Industrial Comm'n,* 80 Ariz. 255, 258, 296 P.2d 443, 445 (1956) (matters unnecessary for decision are dicta and should be avoided, leaving questions for when "actual cases raise such issues"); *State ex rel. Smith v. Carey,* 49 Del. 143, 147, 112 A.2d 26, 28 (1955) (expression of dicta is ordinarily to be avoided, and "certainly a court should refrain from dicta

upon constitutional questions"); *Waste Recovery Coop. of Minn. v. County of Hennepin,* 475 N.W.2d 892, 896 (Minn.App.1991) (court declined ruling on issue scarcely mentioned in trial court because doing so "would be tantamount to an advisory opinion"), *pet. for rev. denied* (Minn. Dec. 9, 1991).

presented are, by definition, obiter dicta). Calling these expressions a "holding" does not bring the issue of future lawsuits within the scope of our review. By any other name, these statements are an opinion volunteered on litigation which is not presently before the court. There is an equal fallacy in the idea that extrajudicial conclusions are within the scope of review if an appellate court simply states its conviction that it could not reach a conclusion to affirm without expressing these opinions. Stated in that fashion or otherwise, the comments and holdings are no more than a device to find fault with the law of the case; they are the dicta of protest.[4] In the last analysis, discussion concerning a future suit is irrelevant to the resolution of the question of whether the surety bond requirement was proper. In fact, the choice of this court to address the topic of future suits will be the first occasion the issue has been raised by anyone associated with these proceedings.

## II. Questionable application of law

Just as I would not express an opinion inviting a future lawsuit, I would withhold an alternative opinion. With this in mind, comment must be made to identify legal questions which cast serious doubt on the merits of an advisory holding inviting future lawsuits. As observed above, a volunteered holding premised on erroneous conclusions misleads those who would prefer to see chapter 350 challenged at this late date.

First, section 562.02 provides that when the required surety bond "is not filed within a reasonable time allowed therefor by the court, the action shall be dismissed with prejudice." Minn.Stat. § 562.02; *see Butkovich v. O'Leary*, 303 Minn. 535, 536, 225 N.W.2d 847, 848 (1975) (dismissal with prejudice is a final determination on the merits). This provision of the statute explicitly recognizes the need for finality concerning legal challenges to bond issues. *See Gram*, 259 Minn. at 147, 106 N.W.2d at 555.

The record in *Gram* underscores the fundamental necessity of finality. The affidavit of Peter Popovich, bond counsel for the Village of Shoreview and later Chief Justice of the Minnesota Supreme Court, explained that without a certification that "there is no litigation pending or threatened * * * no financial institutions, banks, or other investment dealers will accept delivery of said bonds or purchase the same." Popovich also emphasized "it is most important" in the bond trade that "any question of litigation be eliminated by the time of the sale of any bond issue" so that the "cloud cast upon [the] proposed bond issue" can be removed. The record in the instant case is replete with similar testimony that an unqualified bond counsel opinion cannot be given as long as there is a viable legal challenge to the validity of the bonds and the constitutionality of chapter 350. (*See* Richey Aff. at 2).[5]

A pretended affirmance of the trial court effectively undermines the purpose and effect of section 562.02 if it also invites future litigation as a method to avoid the provision of the statute calling for dismissal of suits "with prejudice." This action disregards the clear intent of the legislature. *See* Minn.Stat. § 645.16 (1990) (every law "shall be construed, if possible, to give effect to all its provisions;" when words of a law are clear and free from all ambiguity, "the letter of the law shall not be disregarded under the pretext of pursuing the spirit"). Instead of removing the cloud upon the validity of the bond authorization,

4. I am not averse to reform of the present scheme of law surrounding application of Minn. Stat. § 562.02, nor would I object to harmless dicta asking that the scheme of the law be reviewed. It is quite another thing, however, to usurp the reform function by considering a case that is not before us, and then offering an indefensible legal conclusion on the topic.

5. Counsel for the state advised this court at oral argument that the $270 million Metropolitan Airport Commission bonds were issued on April 23, 1992, only after a qualified bond opinion was issued. The bond opinion reportedly stated that (1) no action was currently pending on the merits, and (2) the standard of review on this appeal was "abuse of discretion" and "it was not likely" that this case would go back to the trial court on the merits. Significantly, counsel indicated that the remaining bonds could not be issued with such a qualified opinion.

the court seeds a storm of controversy with its forecast of future challenges to chapter 350.

Second, it is improper to conclude that taxpayers can wait until after bonds are issued and then assert constitutional challenges to the enabling legislation. No one disputes that individuals who assert that their constitutional rights have been violated "must raise the objection at the earliest available opportunity." *Adelman v. Onischuk,* 271 Minn. 216, 231, 135 N.W.2d 670, 680, *appeal dismissed and cert. denied,* 382 U.S. 108, 86 S.Ct. 257, 15 L.Ed.2d 192 (1965). Moreover, the passing of time may well prevent a suit because of various defenses, such as laches, notwithstanding contrary assertions. *See Schulz v. State,* 151 Misc.2d 594, 610–11, 582 N.Y.S.2d 355, 365–66 (N.Y.Sup.Ct.1992) (court applied laches in action challenging issuance of bonds by government assistance corporation); *Lopp v. Peninsula Sch. Dist. No. 401,* 90 Wash.2d 754, 758–62, 585 P.2d 801, 803–05 (1978) (court rejected argument that laches could not bar a public interest lawsuit and held that the suit was barred by laches).

In *Schulz,* the court stated that the essential element in laches is "delay prejudicial to the opposing party" and observed that delays as short as six months may be inexcusable. *Schulz,* 151 Misc.2d at 610–11, 582 N.Y.S.2d at 365. Thereafter, the court found a constitutional challenge to a bond issue barred under the doctrine of laches, even though the challenge was brought less than two years after the challenged statute authorizing the bonds was passed:

> While the total * * * bond authorization of $4.7 billion has not yet been all issued and sold, a ruling of unconstitutionality would seriously and deleteriously affect the interest of the bond holders who, in good faith, have already purchased * * * $2.4 billion, and would undo the carefully crafted and presumptively constitutional, fiscal plan of the State to provide fiscal assistance to local government.

*Id.* at 611, 582 N.Y.S.2d at 366. The instant case closely parallels *Schulz* in this respect, and because Minnesota law recognizes that finality is critical in bond cases, I am convinced the conclusion that there "is certainly no bar of laches in this case" is suspect.

Third, an invitation for future challenges directly conflicts with the supreme court's observation that the statute should have the "salutary effect" of encouraging any challengers to commence an action *"before any substantial damage will result from a delay in the prosecution of the project." Gram,* 259 Minn. at 154, 106 N.W.2d at 559 (emphasis added); *cf. Greenwood County v. Duke Power Co.,* 107 F.2d 484, 488–89 (4th Cir.1939) ("it was in the interest of all parties" that question of law concerning loan and grant to a county for construction of a power plant "be authoritatively settled *before moneys were advanced and expenditures made* ") (emphasis added), *cert. denied,* 309 U.S. 667, 60 S.Ct. 608, 84 L.Ed. 1014 (1940).

Fourth, an opinion urging later challenges evidently assumes that Minn.Stat. § 562.02 cannot be used to limit a suit once bonds are issued. This assumption is erroneous because there is nothing in the statute which precludes its application once bonds are issued. Rather, the statute applies to any suit brought in any court questioning the validity of any action *"taken or proposed to be taken"* by the public body. Minn.Stat. § 562.02 (emphasis added); *see* Minn.Stat. § 645.16 ("every law shall be construed, if possible, to give effect to all its provisions"). If respondents could show a potential *for* damages in a future action, we have identified no reason why the trial court could not exercise its discretion and require another surety bond pursuant to Minn.Stat. § 562.02, even though such a bond requirement may effectively eliminate judicial review. *See Gram,* 259 Minn. at 153–54, 106 N.W.2d at 558–59 (delay in bringing action may justify imposition of substantial surety bond requirement).

Fifth, there is no merit in the argument that if a future suit were not possible, then Minn.Stat. § 562.02 may be unconstitutional. This argument directly contradicts the explicit holding of *Gram:* "We fail to see

*any* constitutional barrier, either under the Federal or state constitutions, to the power of the legislature to enact the statute under consideration." *Id.* at 154, 106 N.W.2d at 559 (emphasis added). The court reached this conclusion after an extensive discussion concerning the potential deprivation of a person's right to bring a lawsuit. *Id.* at 149–54, 106 N.W.2d at 556–59. This court is in no position to question either the wisdom or authority of the decision in *Gram,* and any attempt to do so is unwarranted.

Sixth, it is incorrect to contend that it would be an abuse of discretion to impose a surety bond requirement if a future lawsuit were not possible. This contention misconstrues the statute and ignores the precedents established by our courts.

The Minnesota Supreme Court has determined that Minn.Stat. § 562.02 is intended to serve particular purposes, viz., discouraging vexatious or unnecessarily duplicative lawsuits. The supreme court has recognized this statutory purpose as a reflection of the standard to be employed by the court when asked to apply the statute. *Village of Elbow Lake v. Otter Tail Power Co.,* 281 Minn. 43, 46, 160 N.W.2d 571, 574 (1968) (purpose of section 562.02 is to discourage "vexatious lawsuits by irresponsible litigants"). This development of a standard for application of this section was refined in *Kilowatt Org. (TKO), Inc. v. Department of Energy, Planning & Dev.,* 336 N.W.2d 529 (Minn.1983). ("Application of section 562.02 was consistent with the legislative goal of permitting public projects to advance by discouraging needlessly duplicative proceedings" even where litigant was not "irresponsible." *Id.* at 532.) Germane to the trial court's holding in this case, the supreme court has also stated that the statute protects taxpayers against inordinate delays in the implementation of legislative acts. *See Gram,* 259 Minn. at 154, 106 N.W.2d at 559.

These supreme court holdings suggest that the trial court's exercise of discretion should focus on a determination of whether a suit is either (1) lacking in merit, (2) duplicative, or (3) unnecessarily delayed.

Given any of these circumstances, nothing in the statute or in the supreme court's decisions suggests that some other standards may compel the trial court to refrain from application of the statute.

Seventh, any reliance on the "certain remedy" provision of the Minnesota Constitution is misplaced. This section was not intended to eliminate the ability of courts to impose costs even if litigants cannot afford them. *See Gram,* 259 Minn. at 149–54, 106 N.W.2d at 556–59; *see also Lommen v. Minneapolis Gaslight Co.,* 65 Minn. 196, 208, 68 N.W. 53, 54 (1896) (litigant does not have the right to conduct his suit in court without costs); *cf. TKO,* 336 N.W.2d at 532–33 (court expressly ruled that dismissal of suit with prejudice was proper even though it effectively blocked judicial review).

Eighth, and finally, the notion that an advisory holding was agreed to by the parties is troublesome. The issue was never before the trial court and none of the parties raised the issue before this court. At oral argument, the parties never agreed to waive any time-barring defenses or the use of Minn.Stat. § 562.02 in the future. Rather there was initial speculation, in response to a question at oral argument, that the plaintiffs could have brought their suit after the bonds had been issued. In addition, even if the parties had "agreed" to allow a later suit, such an agreement should not influence the court. *See State v. Colsch,* 284 N.W.2d 839, 842 (Minn.1979) (even if a party requests an advisory opinion, "such advisory opinions are not sanctioned by this court"); *cf. In re Estate of Peterson,* 202 Minn. 31, 40, 277 N.W. 529, 534 (1938) (consent of parties to litigate cannot confer jurisdiction upon appellate court). Finally, the present appellants could not bring the action and there is no legal authority prohibiting respondents from seeking a similar dismissal of a new suit.

### III. Impact on issuance of bonds

As stated in the beginning, among the dangers of an advisory opinion on future lawsuits is the fact that it wrongfully encumbers the issuance or sale of future bonds authorized by chapter 350. Al-

though the court's expressions may not be "binding authority," such advance approval of future challenges will have the unmistakable effect of reducing, if not destroying, the marketability of these bonds. Ironically, this means that the very evil which the trial court (and this court in affirming) appears to guard against—the imposition of a de facto injunction against the issuance of public bonds—likely becomes a reality because of an advisory opinion. In essence, an advisory opinion constitutes a deliberate urging that the proverbial chickens of destiny come home to roost. *See Cooke,* 38 Ch. D. at 70–71.

Undoubtedly, legal controversies concerning the validity of bond issues may have the effect of a de facto injunction, preventing any issuance of bonds. *Gram,* 259 Minn. at 153–54, 106 N.W.2d at 559 (bonds cannot be issued until litigation "is at an end"). The *Gram* court noted that this result is dictated by the "customary requirement" that before bonds can be delivered, bond counsel must issue an opinion stating that "no litigation [is] pending *or threatened." Id.* at 147, 154, 106 N.W.2d at 555, 559 (emphasis added); *see also United States v. Otter Tail Power Co.,* 331 F.Supp. 54, 62 (D.Minn.1971) ("no-litigation certificate" reflects absence of litigation which may impair marketability of bonds and "is essential to a successful sale" of bonds), *remanded on other grounds,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Alaska Pub. Utils. Comm'n v. Municipality of Anchorage,* 555 P.2d 262, 267–68 (Alaska 1976) (" 'clean' opinion from bond counsel about the availability of debt service coverage is crucial to the marketability" of bonds).

Rather than just addressing the merits of the surety bond requirement, an advisory opinion on future litigation openly encourages doubts about the validity of chapter 350. For practical purposes, as this court must understand, there is not a shade of difference between that advisory opinion and a full reversal of the trial court's decision. In sum, we have no warrant to send a signal to bond purchasers that these bonds are subject to future attack. This threat to the validity of the bonds will have the likely effect of prohibiting the issuance of bonds. *See Gram,* 259 Minn. at 147, 106 N.W.2d at 555 (threat of litigation impairs bond opinion).

## IV. The trial court's proper exercise of discretion

The primary issue in the case still requires brief attention. The trial court explained its surety bond decision by observing that initiation of these proceedings was unduly delayed. We should affirm this rationale of the court. An affirmance based on a much broader construction of section 562.02 is unnecessary and conflicts with prior supreme court decisions.

As stated earlier, the supreme court has developed standards governing a trial court's order for a surety bond pursuant to Minn.Stat. § 562.02: Litigants challenging the issuance of public bonds should be required to post a surety bond when there is a threat of damages and the suit is either vexatious, unnecessarily duplicative or if initiation of the proceedings was unduly delayed. The trial court followed this standard and based its imposition of the surety bond requirement on the conclusion that damages would result from the pendency of the litigation and that the litigation had been unnecessarily delayed until March 1992 in an attempt to interfere with the issuance of bonds.

It is proposed that we disregard this reasoned application of Minn.Stat. § 562.02 and conclude that the trial court's order requiring a bond was justified because a surety bond requirement under Minn.Stat. § 562.02 may be imposed whenever the evidence shows a risk of damages. Thus, it is said that the statute's "harsh effect is to foreclose judicial review if the issues cannot be resolved on the merits before the public suffers 'any substantial damage.' " It is unnecessary for the court to express such a broad application of Minn.Stat. § 562.02 because the trial court found there was a special reason to apply the section in appellants' suit. The court's finding that appellants unnecessarily delayed instituting suit establishes one of the limited circumstances for use of the section

indicates finding of unnecessary delay and the absence of an abuse of discretion.[6]

It cannot be doubted that a justiciable conflict must exist before courts have jurisdiction to determine the constitutionality of a statute. *St. Paul Area Chamber of Commerce v. Marzitelli*, 258 N.W.2d 585, 587 (Minn.1977); *Arens v. Village of Rogers*, 240 Minn. 386, 390–91, 61 N.W.2d 508, 513 (1953), *appeal dismissed*, 347 U.S. 949, 74 S.Ct. 680, 98 L.Ed. 1096 (1954). However, courts will entertain challenges to statutes which have not yet been applied if it appears that the statute will "inexorably lead" to an alleged injury. *The Regional Rail Reorg. Act Cases*, 419 U.S. 102, 140–43, 95 S.Ct. 335, 357–58, 42 L.Ed.2d 320 (1974) (where inevitability of statute's operation against person is patent "it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect"); *Minnesota Pub. Interest Research Group (MPIRG) v. Selective Serv. Sys.*, 557 F.Supp. 925, 928 (D.Minn.) (statute contemplates procedure which will "inexorably" lead to injury), *transferred*, 718 F.2d 1107 (8th Cir.1983), *vacated and remanded on other grounds*, 468 U.S. 1205, 104 S.Ct. 3574, 82 L.Ed.2d 872 (1984).[7]

In *MPIRG*, the court allowed a nonprofit corporation to challenge the constitutionality of a system linking student aid with draft registration even though no student had been denied federal aid under the statute and the Secretary of Education had not yet issued regulations governing the matter. *MPIRG*, 557 F.Supp. at 928–29. Significantly, the court stated that the plaintiff's attack was "on [the] face" of the statute and therefore the case did not need "individualized facts" and there was no need to wait for a certain impact. *Id.* at 929. Moreover, in *Regional Rail*, the Court found that there was no better time to evaluate the validity of the statute because no more settled facts would arise until immediately before the challenged transaction and there were serious risks associated with delaying a decision until the statute was applied. *Regional Rail*, 419 U.S. at 144–45, 95 S.Ct. at 359 (challenged transaction would be practically irreversible).

---

**6.** It is not explained why, on the one hand, we should lament application of Minn.Stat. § 562.02 where the bond requirement may preclude judicial review of a taxpayers' constitutional challenge to the authorization of public bonds; but on the other hand, we should permit the "harsh effect" of the statute to apply whenever damage is shown, thus putting aside application of standards established in supreme court decisions. Evidently, the latter construction of the law is meant to serve the former lament. If application of the statute is sufficiently harsh, this may be seen as a reason to find another means to curb its use—or a reason to question the wisdom of the *Gram* court in upholding the constitutionality of section 562.-02. Or perhaps a harsh version of the statute conveniently rids the case of the trial court's concern about delay, a consideration that would likely threaten future suits that repeat the challenge asserted here.

However, harsh effects of the statute are diminished if it is applied in the more limited fashion suggested in prior supreme court decisions. In addition, the statute explicitly prescribes the trial court's discretionary role since the court "may require" a surety bond "in such amount as the court may determine," even though the court has previously determined that damages may result from the pendency of the litigation. Minn.Stat. § 562.02. In fact, the supreme court in *Gram* specifically noted that the potentially "onerous" implications of a bond requirement under Minn.Stat. § 562.02 were greatly reduced because the statute is discretionary, unlike the mandatory security provisions for temporary injunctions then contained in Minn.Stat. § 585.04 (1960). *Gram*, 259 Minn. at 153, 106 N.W.2d at 559.

Precedents furnish evidence that a trial court has the discretion not to impose a surety bond requirement, even when there may be damages. *See Minnesota Vikings Football Club, Inc. v. Metropolitan Council*, 289 N.W.2d 426, 429 (Minn. 1979) (trial court's discretionary denial of motion for bond under Minn.Stat. § 562.02 was not appealed or questioned); *Adelman*, 271 Minn. at 225, 135 N.W.2d at 677 (trial court's discretionary denial of motion for bond under Minn.Stat. § 562.02 was not appealed or questioned).

**7.** It must be noted that there is no legal authority for the proposition that a citizen does not have to sue until a project is "complete in its shape and size." In fact, this statement is contrary to settled law in Minnesota concerning justiciability, which only requires: (1) the definite and concrete assertion of rights, (2) the contest of rights must affect the legal relations of the parties, (3) the parties must have adverse interests, and (4) the parties must seek specific relief and not just an advisory opinion. *Marzitelli*, 258 N.W.2d at 587–88.

The trial court was within its discretion when it determined that appellants should have brought their suit at an earlier time. First, chapter 350 is specific and detailed, and the enactment clearly authorizes the issuance of bonds and the application of bond proceeds for an airline enterprise. 1991 Minn.Laws ch. 350. Appellants' constitutional challenges address the statute on its face, do not depend upon an application of the statute, and could have been resolved shortly after the statute was enacted in May 1991.[8] Second, similar to *Regional Rail* and *MPIRG,* implementation of the allegedly offensive parts of chapter 350 was clearly imminent no later than November 1991 when Northwest and the state entered into a preliminary agreement detailing most of the financing arrangements.[9] Third, similar to *Regional Rail,* delay in the instant case was imprudent because of the practical problems involved if chapter 350 were declared invalid in any manner after the bonds were issued and construction had begun. Fourth, under *Gram* the taxpayer has the burden to challenge the issuance of public bonds as soon as possible. *Gram,* 259 Minn. at 154, 106 N.W.2d at 559. *Gram* demonstrates that Minnesota public policy, at least as to government authorization of bond issues, dictates early resolution of taxpayer disputes. Finally, appellants have not demonstrated how the absence of the March 1992 agreement would have made an earlier suit impossible or implausible.

For these reasons, a far-reaching application of Minn.Stat. § 562.02 is unnecessary.

### V. Conclusion

We cannot rewrite Minn.Stat. § 562.02, substituting our judgment for that of the legislature. *Alexander Co. v. City of Owatonna,* 222 Minn. 312, 329, 24 N.W.2d 244, 254 (1946). In addition, unless and until it

is modified, we must accept the unqualified decision of the Minnesota Supreme Court that this statute offends neither the Minnesota Constitution nor the Constitution of the United States. *Gram,* 259 Minn. at 154, 106 N.W.2d at 559. Finally, the scope of our review does not allow us to address either the merits of appellants' complaint or the validity of a future suit. Therefore, I would affirm the trial court on the limited ground that the court was within its discretion when it determined that appellants should have brought their suit earlier.

Accordingly, I concur in affirming the trial court but I do not join in the majority opinion of this court.

8. While the portion of appellants' suit challenging the March 1992 determinations concerning compliance with chapter 350 could not have been resolved prior to their existence, the urgency of judicial review is greatly diminished because these issues are not constitutional challenges. In addition, appellants have not proposed on appeal that the compliance issues should be heard except in the event their constitutional claims are litigated. Moreover, judicial review of the policy evaluations are inherently

limited and may well be "needlessly duplicative." *See TKO,* 336 N.W.2d at 532.

9. Significantly, counsel for the state noted at oral arguments that if the suit had been brought in November 1991, after the preliminary agreement had been worked out, there would have been little chance of establishing damages under Minn.Stat. § 562.02.